# **Exhibit B**

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, Sc.                           SUPERIOR COURT

STATE OF RHODE ISLAND     )
                          )
            VS.           )    P1-1991-1941A
                          )
RAYMOND D. TEMPEST        )

**HEARD BEFORE**

**THE HONORABLE JUSTICE ROBERT D. KRAUSE**

**ON DECEMBER 18, 2017**

**APPEARANCES:**

J. PATRICK YOUNGS, III,
CHRISTOPHER R. BUSH, JEANINE
McCONAGHY, ASSISTANT ATTORNEY
GENERALS......................FOR THE STATE
MICHAEL KENDALL, KATHERINE
DYSON, MATTHEW R. TURNELL,
LAUREN E. JONES, BETTY ANNE
WATERS, JOHN E. MACDONALD,
ESQUIRES .....................FOR THE DEFENDANT

ELLEN McNAMARA, RPR
COURT REPORTER

# **C E R T I F I C A T I O N**

 

    I, **ELLEN McNAMARA,** hereby certify that the succeeding pages **1** through **23,** inclusive, are a true and accurate transcript of my stenographic notes.

 

               *McNamara*
_____
ELLEN McNAMARA, RPR
Court Reporter

<u>**Monday, December 18, 2017**</u>

<u>**MORNING SESSION**</u>

THE CLERK:  The matter before the Court is State of Rhode Island versus Raymond Tempest, P1-1991-1941A.

Counsel, please identify yourselves for the record.

MR. YOUNGS:  Patrick Youngs, for the State of Rhode Island.

MR. BUSH:  Christopher Bush, for the State.

MS. McCONAGHY:  Jeanine McConaghy, for the State.

MR. KENDALL:  Good morning, Your Honor.

For the defendant, Raymond Tempest, Mike Kendall, Kate Dyson and Matt Turnell, Lauren Jones, Betty Anne Waters, and John MacDonald.

THE CLERK:  Mr. Tempest, please stand and raise your right hand.

<u>**RAYMOND DENNIS TEMPEST, JR.,**</u>

called as a witness, being duly sworn, testified as follows:

THE CLERK:  Please state your name and date of birth.

THE DEFENDANT:  Raymond Dennis Tempest, Jr., 1-28-53.

THE CLERK:  Thank you.  This matter is ready for disposition.

THE COURT:  The matter will proceed this morning by

1    way of what is known as an Alford plea.  I do not see any

2    members of the media here, perhaps they are, but in any

3    event, cameras will not be permitted.  If anybody has a

4    cell phone and attempts to take a picture by any means,

5    that device will be confiscated.

6        Mr. Tempest has heretofore pled not guilty to the

7    murder charge in this case, and he maintains his

8    innocence.  He will, however, this morning offer what is

9    known as an Alford plea.

10        An Alford plea is in accordance with the United

11   States Supreme Court case of North Carolina v. Alford in

12   1970, which has been referred to on many occasions by our

13   Supreme Court, including Mattatall v. State, 947 A.2d

14   896, 905 (2008).

15        An Alford plea -- and I go over this with you,

16   Mr. Tempest, because I want the record very clear that

17   you understand exactly what you are doing this morning.

18        The Alford plea is a procedure under which a person

19   charged with a criminal offense may, in essence, assent

20   to be found guilty even though he maintains his

21   innocence, as long as the State presents a factual basis

22   for conviction through evidence other than the

23   defendant's own admission.

24        In other words, if you enter an Alford plea, which

25   is accepted by this Court, that plea effectively

1    constitutes a conviction regardless of the fact that you

2    maintain your innocence.

3        Do you understand that?

4        THE DEFENDANT:  Yes, sir.

5        THE COURT:  So under the Alford plea process,

6    although you are relieved of having to expressly admit

7    that you are guilty of the crime of second-degree murder,

8    notwithstanding that you have maintained your innocence,

9    the result is that you will under the law stand convicted

10   of that crime.

11       Do you understand that?

12       THE DEFENDANT:  Yes, sir.

13       THE COURT:  Do you accept that?

14       THE DEFENDANT:  Yes, sir.

15       THE COURT:  Do you agree to that?

16       THE DEFENDANT:  Yes, I do.

17       THE COURT:  Although you are not admitting that you

18   are committing the offense under the Alford plea

19   doctrine, you are acknowledging that there is evidence in

20   this case, which if considered by a jury would be

21   sufficient to support a finding of your guilt beyond a

22   reasonable doubt.

23       Do you understand and accept that?

24       THE DEFENDANT:  Yes, sir.

25       THE COURT:  I have a plea form before me which

 1    indicates that if you are adjudged -- if adjudged guilty

 2    under the Alford plea process, the sentence anticipated

 3    is time served; that is to say, 23 years, seven months at

 4    the ACI.

 5         Is that your understanding?

 6         THE DEFENDANT:  Yes, sir.

 7         THE COURT:  The sheriff is going to show you this

 8    plea form.  Take a look at that plea form and tell me if

 9    that's your signature on it.

10         THE DEFENDANT:  Yes, it is, Your Honor.

11         THE COURT:  Mr. Kendall, is that your signature or

12    one of your co-counsel's?

13         MR. KENDALL:  It's Mr. MacDonald's, Your Honor.

14         THE COURT:  Mr. MacDonald, did you sign that

15    document?

16         MR. MACDONALD:  I did, Your Honor.

17         THE COURT:  Thank you.

18         How old are you, Mr. Tempest?

19         THE DEFENDANT:  Sixty-four.

20         THE COURT:  How far did you go in school?

21         THE DEFENDANT:  Ninth grade.

22         THE COURT:  Have you had any drugs or alcohol or

23    medication in the last 24 hours?

24         THE DEFENDANT:  No, sir.

25         THE COURT:  Are you satisfied with all of the

1        lawyers who have represented you in this case?

2               THE DEFENDANT:  Absolutely.

3               THE COURT:  I'm obliged to tell you this, although I

4        don't think the admonitions apply, that if you are not a

5        United States citizen, a conviction such as this will

6        surely get you deported from this country, you'll be

7        excluded from the country, you'll be denied reentry to

8        it, and you'll be denied a request to become a

9        naturalized citizen.

10              Mr. Kendall and Mr. MacDonald, I have a belief that

11       those consequences will not befall your client, but

12       nonetheless, I take it you have discussed those kinds of

13       consequences with him?

14              MR. KENDALL:  You're correct, it would not apply,

15       Your Honor, but we have fully discussed all of the issues

16       that are necessary.

17              THE COURT:  You understand, Mr. Tempest, that you

18       have an absolute right to trial on the charge.  You would

19       have been presumed innocent.

20              You would not have had to testify or present

21       evidence.

22              And the State would have been required to prove your

23       guilt beyond a reasonable doubt.

24              And you would have had the right to confront and

25       cross-examine witnesses.

1           And, if convicted, as you well know, could have

2      appealed your conviction to the Supreme Court.

3           If your plea is accepted, all of your trial rights

4      and your appellate rights are waived; they disappear.

5           Do you understand that?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  Once this process has been concluded,

8      you give up any right to withdraw the Alford plea without

9      permission of the Court.

10          Do you understand that as well?

11          THE DEFENDANT:  I do, Your Honor.

12          THE COURT:  Has anybody forced you or coerced you to

13     go through this Alford plea process?

14          THE DEFENDANT:  No, they haven't.

15          THE COURT:  Mr. Kendall, Mr. MacDonald, can you

16     confirm for the Court that your client fully understands

17     the import and significance of the proceedings this

18     morning and the nature of the so-called Alford plea?

19          MR. KENDALL:  Yes, I confirm that, Your Honor.

20          MR. MACDONALD:  I confirm that, Your Honor.

21          THE COURT:  Do you have any questions about the

22     process?

23          MR. KENDALL:  No, Your Honor.

24          THE COURT:  Mr. Tempest?

25          THE DEFENDANT:  No, sir.

1          THE COURT:  Mr. MacDonald?

2          MR. MACDONALD:  No, Your Honor.

3          THE COURT:  All right.  You can be seated.

4          I take it, Mr. Youngs, you desire to present to the

5     Court an individual who will make an impact statement and

6     then you may have some comments of your own to make?

7          MR. YOUNGS:  Yes, Your Honor.  My comments will be

8     the factual proffer.  Would you like the impact statement

9     first?

10          THE COURT:  I would like the impact statement first.

11          MR. YOUNGS:  It's Doreen Picard's sister Christine.

12          THE COURT:  Good morning.

13          THE DEFENDANT:  Judge Krause and members of the

14     Court, thank you for the opportunity to speak today.  The

15     content I read is conveyed on behalf of Ron and Simone

16     Picard, my mom and dad.

17          Let's start with the fact that Doreen's actions on

18     that fateful day, February 19, 1982, demonstrate the kind

19     of person she was.  She was selfless, always trying to do

20     the right thing, was strong-willed and confident.  Let's

21     also recognize that Christmas is less than a week away.

22     Our faith is central in our lives and midnight mass was a

23     family tradition.  Our Memere Robidoux always made sure

24     Doreen, Michael, Ronnie, me and all of our cousins were

25     outfitted in matching pajamas, to our dismay.  Our home

1    filled with laughter, joy, and food deep-rooted in French

2    tradition.

3        On October 22, 1959, Ron and Simone had their first

4    child, Doreen.  She was a precious gift from God.  So

5    many photos and Super 8 films memorialize the joy-filled

6    times they shared.  Doreen was truly a miracle.  No

7    matter how many years pass, Doreen remains their little

8    girl, beloved sister, cousin, grandchild, and niece.  We

9    each have a relationship characterized by something that

10   is uniquely Doreen.  To my brother Michael, she is

11   forever a best friend.  To Ronnie, a fun, big sister.  On

12   February 14th, 1982, she found a way to leave a Valentine

13   heart in his car.  Ronnie can never say thank you because

14   he only learned it was from her after she died.

15       Doreen was my hero.  She was the best big sister who

16   shared secrets and taught me how to play sports.  I

17   remember driving to Rhode Island beaches with all the

18   windows rolled down, singing at the top of our voices.

19   There are so many memories that I could stand here for

20   many days sharing her light and love-filled life.

21       The joy we experienced would have to last a lifetime

22   because her life was interrupted when the Sixth

23   Amendment, you shall not murder, was violated.  The

24   killing of Doreen was barbaric, savage and senseless.

25   Her last moments on earth must have been filled with the

1    antithesis of joy.  Not only was she bludgeoned to death,

2    but she was also strangled with her own sweater.  There

3    was barely any blood that remained in her lifeless body

4    because every last beat of her heart pumped and emptied

5    her life's blood in the basement of 409 Providence

6    Street.  The overarching situation about this tragedy is

7    the fact that she had barely anything at 409 Providence

8    Street.  Most of her things were in a new apartment that

9    she was moving into on February 20th, 1982.

10        It took cowardice and blatant disregard for life

11    when a pipe was repeatedly used on the head of a woman

12    weighing approximately 120 pounds.  Make no mistake,

13    while we are within the Court of man today, this blatant

14    disregard for human life is not only judged by man, it is

15    ultimately judged by our God.  It is He who determines

16    the eternal disposition of the soul.  The committed act

17    represents pure evil.  However, this savage, brutal and

18    inhuman circumstance cannot and will never extinguish

19    Doreen's light.

20        Doreen continues to live in the hearts and minds of

21    those she touched.  To our children, she's a hero.  An

22    aunt that they know as an angel.  Her heroic actions give

23    us integrity and strength.  She is dearly remembered as

24    being brave enough to do something when a child was left

25    in the hallway.  A woman who took a risk and halted the

1    savage beating of Susan Laferte.  Doreen was the

2    personification of God's love because, "Greater love has

3    no one than this, than to lay down one's life for his

4    friends."  We stand here today knowing she paid the

5    ultimate sacrifice of her life to save another.

6         In late February of 1982, Doreen was busy preparing

7    to move.  She was also planning a family dinner at her

8    new apartment.  She intended to share that she had

9    recently finished school for her childhood education.

10   You see, she kept her commitment to finish.  She seemed

11   so excited to surprise mom and dad.

12        On February 18, the night before she died, we spoke

13   for a long time.  I was on the downstairs telephone and

14   mom on the upstairs phone.  The three of us talked about

15   curtains and how we had to bring Memere's folding chairs

16   and extra plates.  We giggled as plans were made.  Little

17   did I know that she would never be able to share the

18   surprise with mom and dad or it was the last time we'd

19   hear her voice.

20        The next day, February 19, snow lightly covered the

21   ground.  Mom and dad came in the house with groceries and

22   the phone rang, a woman's frantic voice urged them to go

23   to the Woonsocket police station.  Something bad happened

24   to Doreen.  We'll never forget the images shown on TV of

25   Doreen in a body bag being placed into an ambulance.

1    I cannot even imagine what it was like for mom and

2    dad to have to identify the lifeless body of their little

3    girl, and subsequently to have to go to 409 Providence

4    Street, not to move the last pieces of furniture from the

5    apartment, but to get clothing, the garments she would be

6    buried in.  The surreal and hollow place deep within, and

7    void in our hearts is unfillable.

8        For parents to have to bury a child is unthinkable;

9    under these circumstances horrific.  We made preparations

10   at the funeral home.  I recall the discoloration of her

11   face, uncharacteristic bright lipstick, and Mimsy

12   Fournier apologizing for the thick makeup masking

13   Doreen's brutally beaten figure.  Her head had to be

14   pieced together, her hair arranged to shroud the

15   devastation.  Dad pulled me away as I hugged my big

16   sister.  Before I let go, I felt the raised stitching

17   from the Y-incision.  Could this really be her?  Who was

18   this person in her prom gown, with her delicate crystal

19   rosary rested gently on her hands?

20       Within days we would see her casket lowered into the

21   vault.  We buried her.  The numbness of that experience

22   will never leave us.  These events altered our lives and

23   those around us from those moments, now, and forever.

24       In the years that passed, Ron and Simone remained

25   deeply rooted in their faith, but also had reasons to

1    fear for our safety.  We often received calls with veiled

2    threats.  Our phones had tape-recorders and an attachment

3    for the receiver.  Every time we picked up the phone, we

4    were to press record.  One example is the call where the

5    voice on the other end stated that my dad's business was

6    on fire.  I remember sitting in the parking lot with Dad

7    in his Jeep for hours during the night watching his

8    business.  To be on guard was the norm for us.  Another

9    example is the threat on my life.  I'll never forget that

10   late night when my college dean and campus police came to

11   my dorm room to verify I was there and not harmed.

12        No matter what proceedings occur today, in a way,

13   nothing changes.  She didn't have the opportunity to be

14   at our weddings, at the birth of our children, to see

15   them laugh and re-tell stories of our youth.  Our mom and

16   dad were robbed of seeing her children, to see if they

17   were as spirited as Doreen.  She was loving and caring,

18   an accomplished high school varsity athlete, captain,

19   two-time MVP in volleyball and basketball, and prom

20   queen.  Many still stop my parents to share a fun fact

21   and cherished memory of her.

22        Today I look across the courtroom and see our

23   heroes, a man and a woman married for 58 years, 35 of

24   which fighting for justice in the memory of their first

25   born.  The intimidation, constant threats, and hardships

1    might have discouraged average people.  Ron and Simone

2    are fearless, loving and strong.  Endless hours,

3    conversations, letters, court dates, and appearances

4    before parole boards is not what they envisioned for our

5    family life.  Nor did we plan to attend court for the

6    trial during the same time we made final preparations for

7    my wedding.  Every experience reopens the wounds and

8    interrupts healing.  They and we do not stop because

9    Doreen would do the same for each one of us.

10       Please remember Doreen and the words composed by the

11   poet Mary Elizabeth Frye to express life and death:

12       Do not stand at my grave and weep.  I am not there.

13   I do not sleep.  I am a thousand winds that blow.  I am

14   the diamond glints on the snow.  I am the sunlight on

15   ripened grain.  I am the gentle Autumn rain.  When you

16   awaken in the morning's hush, I am the swift uplifting

17   rush of quiet birds in circled flight.  I am the soft

18   stars that shine at night.  Do not stand at my grave and

19   cry; I am not there.  I did not die.

20       As I approach the end of this document, we would be

21   remiss by not mentioning the devastating injuries Susan

22   had to deal with.  We truly thank God that she survived

23   to raise her beautiful daughters.  The pursuit of justice

24   and truth is nothing short of inspirational, a reminder

25   of the good in humanity.  In grief we have been

```
 1          surrounded by many who fight for Doreen and for our
 2          family.
 3              We'd like to thank those deceased and still living.
 4          In particular, the members of the Court, Ron Pennigton,
 5          Jim O'Neill, Jeffrey Pine, Jim Ryan, Terrence Donnelly,
 6          Francis Lanctot, Rodney Remblad, John Dionne, Alphonse
 7          Auclair, Roger Remillard, Doug Connell, Patrick Youngs,
 8          Jean McConaghy, Chris Bush, Ana Giron, Peter Kilmartin,
 9          and so many others who have persevered to justice.  We
10          are eternally grateful for your dedication, time, and
11          love.
12              Last, but not least, thank you mom and dad.  Without
13          your tenacity, deep faith, and endless pursuit of
14          justice, we would not be here today.  Doreen is with God
15          now and forever smiles upon you and dwells within our
16          hearts.  Thank you.
17              THE COURT:  Thank you, ma'am.
18              Mr. Kendall and Mr. MacDonald, the Alford plea
19          process anticipates that the State will present to the
20          Court a proffer, without objection from the defense,
21          which the Court should consider in making its
22          determination.
23              I take it you are onboard with that?
24              MR. KENDALL:  Yes, Your Honor.
25              THE COURT:  Mr. Youngs.
```

1          MR. YOUNGS:  Thank you, Your Honor.

2          THE COURT:  I will tell counsel that I have been

3    given a copy of the proffer that Mr. Youngs is about to

4    read into the record.  I have reviewed it a number of

5    occasions, and I have thoroughly digested it and am fully

6    familiar with its contents.

7          Proceed.

8          MR. YOUNGS:  Thank you.

9          Your Honor, had this case proceeded to trial, the

10   State would have presented evidence, much as it did in

11   the first trial over 25 years ago, which resulted in the

12   defendant's conviction to second-degree murder, that at

13   about 3:00 p.m. on February 19, 1982, 22-year-old Doreen

14   Picard was beaten to death with a steel pipe in the

15   basement of 409 Providence Street, where she lived in the

16   third-floor apartment.  The cause of Ms. Picard's death

17   was blunt-force trauma, and the manner was homicide.

18         Also badly beaten, but not killed, was Ms. Picard's

19   landlord, Susan Laferte, who lived in the first-floor

20   apartment at 490 Providence Street.  Due to her

21   significant brain injuries, Ms. Laferte has no memory,

22   not only of February 19th, 1982, but also the months

23   before and after she was attacked.  The crime scene

24   suggests that Ms. Picard likely walked in on the beating

25   of Ms. Laferte as she went to do her laundry in the

1    basement, and probably saved Ms. Laferte's life, while

2    losing her own.

3        The defendant, Raymond D. Tempest, Jr., had known

4    and was friendly with Ms. Laferte for several years prior

5    to February 19, 1982.  In addition, both the defendant

6    and Ms. Laferte owned pit bulls that, at some point prior

7    to February 19, they mated.  The defendant owned the male

8    dog and Ms. Laferte the female.  In exchange for

9    providing the male, the defendant was promised the pick

10   of the expected litter.  The defendant, in turn, promised

11   that pick to John Allard, the boyfriend of the

12   defendant's wife's sister.

13       On February 19, at approximately 1:00 p.m., the

14   defendant and John Allard drove from Allard's apartment

15   to 409 Providence Street, went into the basement where

16   the puppies were kept.  Allard selected the puppy that he

17   wanted, and he and the defendant left a short time later

18   with that puppy.

19       A couple of hours later, at approximately 3:30 p.m.,

20   Douglas Heath, who lived in the second-floor apartment of

21   409 Providence Street, came home from work and made the

22   horrific discovery in the basement of the two badly

23   beaten women.

24       There is no inculpatory or exculpatory physical

25   evidence in this case, either from the crime scene in the

1    basement of 409 Providence Street or the murder weapon, a

2    steel pipe that the police recovered four days after

3    Doreen Picard's murder in the front hallway at 409

4    Providence Street.  The lack of physical evidence in the

5    basement may be attributable to, among other things, the

6    fact that numerous police officers and rescue personnel

7    descended upon the basement on February 19th, in an

8    effort to save the lives of the two women.

9        The murder weapon, a steel pipe, was found leaning

10   against the wall in the front hall of 409 Providence

11   Street by the defendant's brother Gordon Tempest, a

12   Woonsocket detective, four days after the murder.

13   Although officers had searched that hallway shortly after

14   Ms. Picard's murder, and one police officer would have

15   testified to seeing the pipe at that time and that it

16   appeared to him then that the pipe was covered in what he

17   thought was rust, it was not seized because at that time

18   the police did not believe that Ms. Picard and

19   Ms. Laferte had been attacked with a pipe.  By the time

20   the pipe was seized four days after the murder, it had

21   been wiped clean.

22       As the investigation by the Woonsocket Police

23   Department proceeded, the defendant was asked four times

24   within the first few weeks after the murder to give a

25   statement.  The statements given by the defendant, the

1    first one, on the evening of February 19th, to his

2    brother, the Woonsocket detective, were inconsistent and

3    the defendant, when finally asked in the last two

4    interviews, he never explained where he was at the time

5    of the murder.

6         The crime went unsolved for close to a decade.

7    During that time two Woonsocket detectives, Pennington

8    and Connell, continued to work the case and they found a

9    number of witnesses who implicated the defendant in Miss

10   Picard's murder.

11        Matthew Mandeville:  At around about 2:30 in the

12   afternoon of February 19th, Mr. Mandeville saw the

13   defendant near Sylvia's Cafe in Woonsocket in a maroon

14   car that the defendant's brother-in-law, Robert Monteiro,

15   was driving.

16        Lisa Wells Ladue:  Ms. Ladue was 15 at the time of

17   the murder and lived in the second-floor apartment at 409

18   Providence Street with her mother and stepfather, Douglas

19   Heath.  Ms. Ladue arrived home at about 3:20 that

20   afternoon and saw a maroon car parked behind the house.

21   When the rescue arrived, the maroon car was gone.

22        Sheri Richards:  Ms. Richards was John Allard's

23   girlfriend and saw the defendant standing next to a

24   maroon car talking to Robert Monteiro outside her

25   apartment at about 4:30 or 4:45 on February 19th.  The

1    defendant was wearing different boots than she had seen

2    him in earlier in the day.  Ms. Richards also described

3    the defendant's attempts to have her and Allard create a

4    false alibi for him for the time of the murder.

5         Terrence Gelinas:  Mr. Gelinas has known the

6    defendant for most of his life.  Mr. Gelinas lived on

7    Providence Street in February of 1982 and was standing

8    outside about a block away from 409 Providence Street at

9    the time of the murder.  A couple of days after

10   Ms. Picard's murder, Gelinas gave a statement to the

11   Woonsocket Police Department, and when he was dropped off

12   outside his residence on Providence Street, he found the

13   defendant waiting for him.  When Gelinas went to speak

14   with the defendant, the defendant stated, "I want you to

15   tell me the truth.  Did you see me leave?"  The defendant

16   went on to explain that he was at 409 Providence Street

17   on the afternoon of the murder, but left right before the

18   attack.  The defendant was emotional and said that he was

19   afraid that the police would think that he committed the

20   crime.  A year or so later, the defendant was talking to

21   Gelinas about Susan Laferte.  He said that he, the

22   defendant, should not have been tapping her.  In the next

23   decade the defendant on a few occasions threatened

24   Gelinas to stay out of this or tried to get Gelinas to

25   change what he had told the police that the defendant had

1    said to him on earlier occasions.

2         John Guarino:  He lived in the same apartment

3    building as the defendant in 1983.  One night he went to

4    a club with the defendant and asked him about the murder.

5    The defendant described how he beat both women.  A few

6    weeks later, the defendant went to Guarino's apartment

7    and told him that he better keep his mouth shut and

8    claimed the police had no proof.

9         Loretta Rivard:  During the winter of 1987,

10   Ms. Rivard was in a bar in Blackstone, Massachusetts

11   where she saw the defendant.  At the time, she knew of

12   him but had never spoken to him.  After spending time

13   together at the bar, they drove to Ms. Rivard's

14   residence, where the defendant stated, "The girl that was

15   killed on Providence Street, yeah, well, I did it."

16        Ronald Vaz:  Mr. Vaz lives on a farm in Burrillville

17   and was friendly with the defendant in the 1980s.  He saw

18   the defendant in Woonsocket two days after the murder and

19   the defendant told him that he was in trouble, that they

20   would get him for this one and that even his father would

21   not be able to get him out of this one.  The defendant

22   also made several visits to Mr. Vaz's farm in

23   Burrillville, where he used cocaine.  During those visits

24   the defendant described his relationship with Ms. Laferte

25   and said that on February 19th, 1982, he and Ms. Laferte

1       had an argument about the puppies and their relationship,

2       during which Ms. Laferte hit him and the defendant hit

3       her back.

4            Except for Mr. Mandeville, each of those witnesses

5       testified in the defendant's 1992 trial.  Mr. Mandeville

6       testified in the perjury trial for Gordon Tempest.  The

7       State would have presented the transcripts of the

8       deceased Richards and Guarino, and expected the other

9       witnesses to testify consistent with the earlier

10      testimonies, the transcripts of which the State included

11      in the trial binders that it submitted to the Court in

12      July.

13           Since the last trial, the State met with Charles

14      Voyer, who was driving on Providence Street on February

15      19th, 1982, and saw a man he has identified as the

16      defendant, walking on Providence Street with a red

17      substance splattered on him.  This was shortly before he

18      noticed the police at 409 Providence Street.

19           In addition to these witnesses, and consistent with

20      the 1992 trial, the State would've introduced testimony

21      from numerous witnesses who have testified about the

22      handling of the crime scene and the evidence, the

23      circumstances of the installation of locks at 409

24      Providence Street the day after the murder, and the flow

25      of the lengthy investigation, including the impediments

1     to it.

2          The State would've also called the medical examiner

3     to testify about the cause and manner of Ms. Picard's

4     death.  An expert in trace evidence analysis would have

5     testified as he did at the 2015 post-conviction relief

6     hearing, that none of the 36 hairs found in Ms. Picard's

7     hands after her death contained roots, but rather were

8     either broken or cut and that, as such, it is unlikely

9     the hairs were pulled from someone else's head.

10         At the end of the presentation, the State would have

11    proven the defendant's guilt to murder in the second

12    degree beyond a reasonable doubt, just as it did in 1992.

13         Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Youngs.

15         As I said at the outset of Mr. Young's comments, I

16    am thoroughly familiar with the proffer that he has just

17    read into the record.  I'm also familiar and have

18    reviewed the transcripts that Mr. Youngs has referred to,

19    and I am more than satisfied that there is ample evidence

20    beyond peradventure that the proffer that Mr. Youngs

21    makes would be sufficient to find the defendant guilty

22    beyond a reasonable doubt of the charge of second-degree

23    murder.

24         I take it counsel for the defendant has no further

25    information or comments to offer and that all that is

1      left is to invite the defendant, should he be interested,

2      to exercise his right of allocution.

3           Mr. Tempest, you have an opportunity, should you

4      choose to exercise it, to make any statement you care for

5      the record.

6           Do you wish to do that?

7           MR. KENDALL:  No, Your Honor.

8           THE DEFENDANT:  No, Your Honor.

9           THE COURT:  Very well.  The sentence will therefore

10     be imposed as earlier indicated upon the record and in

11     the plea form:  Time served, 23 years and seven months.

12          We are adjourned.

13           (Proceedings adjourned at 10:11 a.m.)