## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

_____
                                    )
RAYMOND D. TEMPEST, Jr.             )
                Plaintiff,          )
                                    )
        v.                          )        No. 1:20-cv-00523-MSM-LDA
                                    )
RODNEY REMBLAD, et al.              )
                Defendants.         )
_____   )

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This case brings to the Court's attention a state criminal prosecution which has received extraordinary notoriety in the crime annals of Rhode Island, stemming largely from the nine years it took between the death of Doreen Picard[1] and the indictment of Raymond Tempest for murder; and not in small measure because of the extent of the bad faith prosecutorial tactics uncovered in Mr. Tempest's bid for relief

---

[1] Susan Laferte, a tenant in the building in which Ms. Picard lived, was seriously injured in the attack, and suffered significant memory loss. *Tempest v. State,* 141 A.3d 677, 680 (R.I. 2016).  By referring to the Picard murder, the Court does not intend to minimize at all the traumatic and critical injuries Ms. Laferte received. Notwithstanding that one theory of the prosecution was that Mr. Tempest's intended victim was Ms. Laferte, and that Ms. Picard simply showed up at the wrong time, the case has, in the courts and in the press, been most often referred to as the "Doreen Picard murder."

after serving 23 years for a murder he maintains he did not commit. *Tempest v. State,* No. PM20041896, 2015 WL 4389908, at *17-28 (R.I. Super. July 13, 2015).[2]

The defendants – the City of Woonsocket, then-Chief of Police Rodney Remblad, and then-Police Detective Sgt. Ronald Pennington[3] -- have moved to dismiss, posing the question of whether there is any recourse available to Mr. Tempest for law enforcement misconduct because, after serving 23 years and 7 months for second-degree murder, he voluntarily accepted a second conviction following a successful appeal of his first conviction and failed to bring this action in time.

Mr. Tempest brought this lawsuit seeking damages for many facets of the prosecution. For the reasons explained below, the Court GRANTS the Motion to Dismiss all counts except Count V.

---

[2] The Rhode Island Supreme Court affirmed the grant of Mr. Tempest's post-conviction application. The trial court's decision, *Tempest v. State,* No. PM20041896, 2015 WL 4389908, at *1 (R.I. Super. July 13, 2015), is referred to throughout as "*Tempest I.*" The Supreme Court's affirmance, *Tempest v. State,* 141 A.3d 677, 680 (R.I. 2016), is referred to as "*Tempest II.*"

[3] Mr. Remblad is no longer Chief of Police, https://www.woonsocketri.org/police-department; Mr. Pennington has been reported as retired. Woonsocket, investigators seek dismissal of malicious-prosecution lawsuit (providencejournal.com) (April 7, 2021).

# I.    BACKGROUND

This case has been written about many times.  For years it was featured on websites publicizing unsolved crimes.[4]  The trial judge granting Mr. Tempest's application for post-conviction relief in 2015, did a yeoman's job in succinctly describing the now-40-year-old crime:

> At approximately 3:20 on the afternoon of February 19, 1982, fifteen-year-old Lisa Wells (Lisa or Ms. Ladue) came home to the triple-decker apartment at 409 Providence Street in Woonsocket, Rhode Island. She checked the mail, walked around the exterior of the building, and entered the tenement home through the back door.  En route, according to her testimony at trial, she noticed an unfamiliar maroon car parked in the driveway.  When Lisa entered the building, she noticed three-year-old Nicole Laferte (Nicole) sobbing in the hallway, saying that her "mother was downstairs sick." Lisa brushed off Nicole's actions as a cry for attention "because [she] heard some moving around downstairs" and went up to her apartment.
>
> Mr. Heath arrived home from work ten minutes later and, like Lisa, entered the apartment building through the back. At the time he arrived, the driveway was empty. When he walked in the rear hallway on the first floor, he saw Nicole, still crying, and "[s]tanding at the door to go down into the cellar." Mr. Heath stopped and asked Nicole what was wrong. Nicole replied that her mother was downstairs, "lying down."
>
> When Mr. Heath descended the stairs into the basement, he was met with a grisly scene. As he stated at trial, "there was blood everywhere[;] … it was on everything[,]… splattered … on the pipes[,] … on the washer and the dryer [and] on the floor." "[L]ooking across the cellar [,] [Mr.

---

[4]   *See, e.g.,*  https://www.reddit.com/r/UnresolvedMysteries/comments/5h09qn/the_1982_murder_of_doreen_picard_and_attempted/d Murder of Susan Laferte: Was an Innocent Man Wrongly Convicted? (New "Trail Went Cold" Episode) : UnresolvedMysteries (reddit.com). The Innocence Project included the case in its "Guilty Plea Series."   https://innocenceproject.org/guilty-plea-series-the-case-of-raymond-tempest/.  The overturning of his conviction was similarly big news. *See,* https://www.reuters.com/article/us-usa-rhode-island-tempest/rhode-island-mans-1992-murder-conviction-overturned-on-dna-idUSKCN0PN2NA20150713; https://www.dailymail.co.uk/news/article-3159633/Judge-overturns-Rhode-Island-mans-1992-murder-conviction.html

Heath] saw a body, a person, between the washer and the dryer sitting .... [He] couldn't recognize who th[e] person was [because there] was so much blood[.]" Heath would later learn that this person was his upstairs neighbor, twenty-two-year-old Doreen Picard. Next, he looked around and saw Ms. Laferte on the left side of the basement, "lying face down in a pile of -- puddle of blood." Sensing the urgency of the situation, Mr. Heath ran upstairs to call the police to get help for the two women who had been so brutally attacked. He also grabbed two towels, presumably hoping to render some first aid. However, when Mr. Heath returned back to the cellar, he "just looked around" and realized "the towels w[ould]n't [be] of any help [.]"

Due to the extent of the injuries sustained and the deluge of blood at the scene, first responders believed the attacks were the result of a shooting. It was only later, upon Ms. Laferte's admission to the hospital, that it was learned the wounds were the result of blunt force trauma.

*Tempest I* at *2 (citations to state court record omitted).

The ensuing investigation was acknowledged by the prosecution to have been

"a disaster."

Assistant Attorney General James Ryan (Mr. Ryan) stated at trial that the severe lack of physical evidence was due to the fact that "the job [*i.e.,* the necessary investigatory procedures] didn't get done" and that "[e]very police officer from the Woonsocket Police Department seems to have been there except for the ones who should have been there." *Id.* at 2066:20-23. Noting the "chaos" and "disorder" surrounding the collection of evidence, Mr. Ryan went on to say that "the end result[ ] is that the crime scene was contaminated." *Id.* at 2067:14-17. Nevertheless, four days after the murder, the police were able to locate a lead pipe that Mr. Ryan would later identify as the murder weapon at trial. Despite the efforts of the Woonsocket Police Department, for nine long years no one was charged in connection with this heinous act until, on June 5, 1991, a Grand Jury indicted Mr. Tempest for the murder of Doreen Picard.

*Id.*

The chronology over the past four decades is important to this Court's

discussion of the Motion to Dismiss.

4

| February 19, 1982: | Doreen Picard found dead at her home. |
| June 5, 1991: | Raymond Tempest indicted for murder. |
| April 1992: | First trial, leading to conviction of 2nd degree murder. Sentenced to 85 years in prison |
| January 11, 1995: | RI Supreme Court affirmed, 651 A.2d 1198 (RI 1995). |
| April 8, 2004: | Post Conviction Relief ("PCR") filed in Providence Superior Court. |
| July 13, 2015: | PCR granted, 2015 WL 4389908. |
| July 14, 2016: | Grant of PCR affirmed, 141 A.3d 677 (RI 2016). |
| December 18, 2017: | Tempest enters *Alford* plea to 2nd degree murder, sentenced to 23 years, 7 months' time served. |
| December 17, 2020: | Tempest files C.A. 1:20-cv-00523 in US District Court. |

Law enforcement conduct throughout, encompassing the investigation, the first conviction and, allegedly, the state's continued prosecution after that conviction was vacated, gave rise to the civil action now before this Court.

## II.    JURISDICTION AND STANDARD OF REVIEW

Mr. Tempest claims federal question jurisdiction, invoking 28 U.S.C. § 1331. The core of his complaint is that the defendants violated his federal constitutional rights, and he brings this action pursuant to 42 U.S.C. § 1983.   He claims supplemental jurisdiction over three state court claims.   The instant matter is a Motion to Dismiss, and the Court's function is to examine the Complaint to determine whether, with respect to each of the counts, it states a plausible claim for relief pursuant to Fed. R. Civ. P. 12(b)(6).   To survive a Motion to Dismiss, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)

5

(internal citation omitted).  The reviewing court must assume the truth of all "well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008).

In this case the defendants do not contend that the Complaint lacks sufficient factual allegations or fails the standard of "plausibility."  Instead, they seek dismissal based on law: whether the malicious prosecution claims satisfy the legal elements of the cause of action, whether the due process and related claims are barred by a rule of judicial policy, and whether all claims run afoul of the statute of limitations.

### III.   ANALYSIS – SPECIFIC COUNTS

### A.  Counts I and VII - Malicious Prosecution; Count IX – Respondeat Superior

Count I sets forth a claim of constitutional-level malicious prosecution, grounded in the Fourth and Fourteenth Amendments to the United States Constitution.  Count VII sets forth a common law state tort claim of malicious prosecution.  Both fail for the same reason.  Also affected is that portion of Count IX which claims that the City of Woonsocket is responsible on a respondeat superior theory of liability for the malicious prosecution torts of its employees.

The constitutional and common law torts share three elements: "that 'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013), quoting *Evans v. Chalmers,* 703 F.3d 636, 647 (4th Cir.2012) (constitutional claim); *Dyson v. City of Pawtucket*, 670 A.2d 233, 239 (R.I. 1996); *Clyne v. Doyle*, 740 A.2d 781, 782 (R.I.

6

1999) (common law claims).  In the First Circuit until very recently, a termination favorable to the plaintiff meant a disposition that at least "implie[s] innocence." *Jordan v. Town of Waldoboro*, 943 F.3d 532, 545 (1st Cir. 2019) (dismissal because witness died did not imply innocence).  *Accord, Jones v. City of Boston*, 135 Fed. Appx. 439, 440 (1st Cir. 2005) (dismissal apparently as a compromise resolution was not favorable).

While this Motion to Dismiss was pending, the United States Supreme Court decided *Thompson v. Clark*, ___ U.S. ___, 142 S. Ct. 1332 (Apr. 4, 2022).  Rejecting the basis of the First Circuit's rule, the Court held that, as to the constitutional tort of malicious prosecution, the prosecution at issue need only have ended without a conviction.  *Id.,* 142 S. Ct. at 1335.  Although the Court did not explicitly mention the First Circuit's rule in its description of a conflict among the Circuits over the meaning of "favorable termination," *Jones* had made clear that the phrase meant "facts permitting the inference that the charges . . . were dismissed because [of] innocence and there were no reasonable grounds to prosecute []."  *Thompson* has changed that standard.

Mr. Tempest maintains that the *Alford* plea he entered on December 18, 2017, constituted a "favorable termination."  An *Alford* plea is one in which a criminal defendant maintains innocence while at the same time submitting to a judgment of conviction and sentence.  It takes its name from the case of *North Carolina v. Alford*, 400 U.S. 25 (1970), in which the United States Supreme Court held that a criminal trial court could enter a judgment of conviction and impose sentence on a defendant

7

who protested innocence, so long as the prosecution provided a factual basis of guilt for the plea.   Ordinarily, a defendant's *nolo contendere* or guilty plea would demonstrate the factual basis required by Fed. R. Crim. P. 11 and comparable state court rules.  In the absence of that acknowledgment by a defendant claiming factual innocence, the government's proffer of facts amounting to guilt is sufficient.  *Id.*

Because it allows a criminal defendant to present a public persona of innocence yet benefit from the negotiated sentence that generally accompanies a waiver of trial, an *Alford* plea may be considered a favorable outcome by a defendant reluctant to publicly admit guilt whether because of actual innocence or an unwillingness to acknowledge guilt.  *See generally* Conklin, "The Alford Plea Turns Fifty:  Why it Deserves Another Fifty Years," 54 Creighton L. Rev. 1 (2020).   "An *Alford* plea is an arrangement in which a defendant maintains his innocence but pleads guilty for reasons of self-interest."  *United States v. Taylor*, 659 F.3d 339, 347 (4th Cir. 2011).

The law, however, is not concerned with a defendant's public persona and both Rhode Island and federal courts consider an *Alford* plea, followed by the entry of a judgment of conviction, to be an adjudication of guilt like a conviction entered after a guilty plea.  Rhode Island has held that an *Alford* plea is the complete equivalent of a guilty plea for purposes of conviction and is therefore not a "favorable termination" as required for a malicious prosecution claim.  *Armenakes v. State*, 821 A.2d 239, 242 (R.I. 2003); *State v. Mattatall,* 603 A.2d 1098, 1118 (R.I. 1992).   *Accord, Abimbola v. Ashcroft,* 378 F.3d 173, 181 (2d Cir. 2004) ("an Alford plea *is* a guilty plea") (emphasis original).  While an *Alford* plea followed by conviction terminates the prosecution in

8

a way that gives voice to the defendant's claim of innocence, the resulting conviction does not, on the part of the judicial institution, in any way imply innocence. To the contrary, the court accepting the plea responds as if the plea were one of guilty.[5] Because it *is* a conviction, an *Alford* plea does not meet the *Thompson* standard and the plea is fatal to both malicious prosecution claims. The Motion to Dismiss Counts I and VII, and that portion of Count IX claiming respondeat superior liability on the part of the City, is therefore GRANTED.[6]

---

[5] This will come as no surprise to Mr. Tempest. At the time of the plea, the Superior Court judge warned him that "if you enter an Alford plea, which is accepted by this Court, that plea effectively constitutes a conviction regardless of the fact that you maintain your innocence."  (ECF No. 12-3 at 2-3 (internal numbering), 12/18/17 hearing transcript.)  Mr. Tempest responded that he understood. *Id.* Ordinarily a Court is limited on a Motion to Dismiss to the allegations in the Complaint, but the Alford plea is relied on by both parties who refer to it extensively and is incorporated into Mr. Tempest's Complaint as the basis for his contention that his case ended "favorably." *Cruz v. Melecio,* 204 F.3d 14, 21 (1st Cir. 2000).

[6] There is no room for flexibility or discretion in this ruling. State law establishes that an *Alford* plea results in a conviction, and both state and federal law now clearly hold that any conviction fails to support a "favorable termination." It is clear to the Court that the state prosecutors deliberately used their leverage to push Mr. Tempest into an *Alford* plea, perhaps with intent to shield Woonsocket and its officers from a subsequent civil action. Even a shred of consideration given to the effect of a conviction on an action for damages would, in this Court's opinion, border on malice and amount to a violation of the prosecution's public trust. The prosecution dangled immediate release in front of Mr. Tempest as the carrot while wielding a powerful sword:  it informed him that if he were to stand trial a second time and be convicted, the state would press for the same eighty-five years of jailtime (more being ordinarily precluded by law) and appear at each and every one of his parole hearings to object to parole for the rest of his natural life. (ECF No. 17-1, Affidavit of David Kendall, ¶ 21.)  While insisting after retrial on the same sentence is not itself either unusual or indefensible, the threat to ensure that a first offender entitled by law to consideration for parole *never* gets it *is,* in this Court's experience, unusual. The trial judge's rulings, which clearly also influenced Mr. Tempest's decisions, cannot be laid at the feet of the prosecution but were invited by them. The state planned to *reintroduce* much of the evidence used in the first trial although it was contradicted by the

## B.  Count II:  Due Process

Multiple and egregious violations of due process in the prosecution of Mr. Tempest turned what is supposed to be a level playing field into an uphill climb – ultimately one he could not surmount at trial.  The Court refers the reader to the considered opinions of both the Rhode Island Superior Court *(Tempest I)* and the Supreme Court (*Tempest II)* in vacating Mr. Tempest's conviction on collateral attack.

Adjectives such as "disast[rous]" used by a seasoned prosecutor in describing the slipshod investigation that, nine years after Doreen Picard's death swept Mr. Tempest into a criminal courtroom, hardly do justice to the reality.

> Meanwhile, the crime scene was "never properly secured" or "cordoned off" while a swarm of officers packed into the basement. (Trial Tr. 2066:6-7, Apr. 20, 1992.) Nevertheless, the only person available to gather evidence was "totally unfamiliar with B.C.I. procedures and the handling of the evidence." *Id.* at 2066:13-14.  Midway through the night, the police captain arrived, having "spent several hours in a bar" before taking the reins in directing the processing of the scene.  *Id.* at 2068:7.

*Tempest I* at *2.  The state conceded the crime scene was "contaminated," characterized by "chaos" and "disorder."  *Id.*

But that was just the beginning.  Preparing for trial, members of the Woonsocket Police withheld favorable evidence, distorted evidence, and, at least in spirit suborned perjury to bolster their case.  Some examples from the extensive state

---

concealed exculpatory material.  *Id.,* ¶¶ 16, 17.  In addition, the state moved – successfully – to exclude testimony from an expert on police practices who the state conceded was "phenomenally qualified" to testify.  The rulings from the Superior Court judge, predominantly in favor of the prosecution, reinforced Mr. Tempest's fear of re-conviction.  *Id.*, ¶ 20.

court decisions give but a flavor of the lengths to which Woonsocket law enforcement, and the chief state prosecutor, went to ensure a conviction.[7]  Donna Carrier, for example, was an important potential witness who claimed that Mr. Tempest had confessed to her.  The state was in possession, however, of statements she had given lead prosecutor James Ryan that contradicted her assertions about the involvement of Mr. Tempest's brother, Gordon Tempest, in allegedly concealing the crime.  These statements would have undermined her credibility about other matters.[8]  *Tempest I* at *19.  Yet not only were those statements not disclosed to the defense, but Mr. Ryan also actually *directed* Ms. Carrier *not* to include these "discrepancies" in her testimony because, he wrote in his notes, "too late, don't volunteer new info, will cause big problems."  *Id.*  Woonsocket Sgt.  Pennington[9] admitted at trial that he had coached witnesses, "suggest[ing] facts the witness had not raised to prod their memory"; others in Woonsocket law enforcement "fed witnesses information in an effort to move the case against Mr. Tempest forward."  *Id.* at 21.  "[W]itnesses adopt[ed] different or completely new versions of events to match theories held by their police interviewers."  *Id.*

   Significantly, the state relied heavily on the testimony of fifteen-year-old

---

[7] No individuals working on the prosecution in the Department of the Attorney General have been sued.

[8] The failure to turn over material evidence adversely affecting the credibility of government witnesses comes within the *Brady* rubric.  *Giglio v. United States,* 405 U.S. 150, 154 (1972).

[9] Sgt. Pennington, who had only one year's experience as a detective at the time, headed the investigation.  *Tempest I* at *23.

tenant Lisa Ladue that, when she arrived home in mid-afternoon, she saw a maroon car in the driveway of 409 Providence Street where Doreen Picard was killed. The government's theory was that a friend of Mr. Tempest's named Monteiro borrowed a maroon vehicle owned by John McMann to drive Mr. Tempest to the Providence Street apartment. The maroon car – coupled with the conjecture that it was used to ferry Mr. Tempest around – was the only evidence linking Mr. Tempest to the crime scene. Prosecutors, however, concealed the fact that both Mr. McMann and his son Kevin, who often borrowed the car, told Woonsocket Police while the trial was ongoing "that he never loaned it out" and specifically that he had not loaned it to Mr. Monteiro that day. *Tempest I* at \*17, *Tempest II* at 690 (Suttell, CJ, concurring). Those statements, Superior Court Judge Daniel A. Procaccini found, tended to show that another witness was mistaken when she claimed to have seen Mr. Tempest standing by the maroon car in the driveway, since the statements impeached the state's theory that Mr. Monteiro had driven him there. *Tempest I* at \*17.[10] Woonsocket police even

---

[10] "The statement by Ms. Ladue that she saw a maroon car upon returning home the afternoon of the murder, and the corresponding testimony from Ms. Richards that she saw Mr. Tempest standing by a maroon car driven by Mr. Monteiro that same afternoon, constitute the evidence linking Mr. Tempest to the crime scene at the appropriate time." *Tempest I* at \*19 (emphasis original). Due to the suggestive questioning of Woonsocket police, Ms. Richard's story over the ten times she was interviewed ("a barrage of recurrent suggestive questioning") "shifted in lockstep with the State's theory of the case." *Id.* at \*26.

The extent to which law enforcement tried to influence witnesses to incriminate Mr. Tempest was very clearly shown in a recording of a potential witness named Shaw who was interviewed in a bar at 11 p.m. by defendant Remblad. According to Judge Procaccini, the Commander "fed a motive" to the witness and coached him on how the murder had taken place. *Tempest I* at \*27. A piece of the interview, in which Shaw referred to Mr. Tempest as "Beaver," is the following:

concealed this critical information from the lead prosecutor who never knew of it.

Mr. Tempest's struggle to vacate his conviction – his "marked doggedness" as described by Judge Procaccini in rejecting the state's claim that he had delayed too long -- was virtually Herculean.[11]   *Tempest I* at *6-7.  A high school dropout lacking the funds to hire an attorney, *Tempest I* at *5, Mr. Tempest first mounted a campaign to find someone to take his case.  Enlisting the help of volunteers, some without any

---

"Shaw: Beaver didn't do it.

"Remblad: Well who did it then?

"Shaw: Beaver didn't do it man.

"Remblad: Well who did it?

"[ … ]

"Shaw: I mean it, Beaver didn't do it.  Beaver didn't do it.

"Remblad: Well then who did Danny?

"Shaw: You, you real, do you really think Beaver did it?

"Remblad: I do.  [ … ] They've got good evidence the police.

"[ … ]

"Shaw: Through all your professional fucking … I think he did it too."

*Tempest I* at *27 (citations to state court record omitted).  Ultimately, Shaw did not testify.  *Id.*

[11] Judge Procaccini used precisely that term in describing "the Herculean task of investigating Mr. Tempest's case …. The staggering enormity of such an undertaking." *Tempest I* at *8.  He noted that a law firm representing Mr. Tempest pro bono in state court "committed six lawyers to this case, expended over 6000 attorney and staff hours, and spent in excess of $161,000 in investigatory expenses since 2012 in bringing Mr. Tempest's [2015] petition." *Id.*

legal training and one spending thousands of dollars out of her own pocket to hire an investigator, he and the friends and family he recruited scoured records and mounted a letter drive to obtain professional legal help.  For three whole years, they reached out to the New England Innocence Project ("NEIP") until finally inducing the agency to investigate the case in 2003.  It took six years before the NEIP "expanded its case review to include evaluation of [the instant] postconviction issues."  *Id.* at *6.  The next *decade* was spent trying to obtain DNA testing; those results did not come until 2015.  *Id.*

In a case in which "not a shred of physical evidence tie[d] Mr. Tempest to the scene," *Tempest I* at *16, the effect of the skewing of the evidence by prosecutorial misdeeds cannot be overstated.  But this Court need not assess the effect of that misconduct in the criminal case:  the state courts have done that already by vacating his first conviction.

The task now at hand is to determine whether Mr. Tempest can proceed past the gateway of Fed. R. Civ. P. 12(b)(6) in pursuing a demand to be compensated monetarily for the injuries he suffered at the hands of those who were supposed to be doing justice not only to the victims of the heinous attack at 409 Providence Street but also to the man who was accused of carrying it out.

There is no question that Mr. Tempest has pled a plausible claim that his due process and fair trial rights were violated.  *Brady v. Maryland,* 373 U.S. 83, 87 (1963), has long required that the prosecution turn over to the defense requested evidence

favorable to the accused.[12]   Beyond *Brady*, the government must conduct itself fairly in its apprehension, investigation, and litigation tactics:

> It is axiomatic that the government must turn square corners when it undertakes a criminal prosecution.  This axiom applies regardless of whether the target of the prosecution is alleged to have engaged in the daintiest of white-collar crimes or the most heinous of underworld activities.

*Ferrara v. United States,* 456 F.3d 278, 280 (1st Cir. 2006) (plea vacated where prosecution failed to disclose that key witness had recanted).   At their core, rules regarding the prosecutorial obligation to turn over material evidence to the defense that casts doubt on the government's case exist to safeguard the fundamental right to a fair trial, the touchstone of due process.  *Smith v. Phillips,* 455 U.S. 209, 219 (1982); *Conley v. United States*, 415 F.3d 183, 193 (1st Cir. 2005) (failure to disclose FBI memorandum undercut right to fair trial).

The first difficult obstacle that Mr. Tempest must overcome is not the need to demonstrate a plausible claim.  Instead, it is to surmount the hurdle that may be presented by *Heck v. Humphrey,* 512 U.S. 477 (1994).  *Heck* reflected the Supreme Court's unwillingness to see civil actions substitute for habeas corpus petitions to challenge criminal conviction.[13]  Beyond that, its concerns were twofold: a desire to

---

[12] The question of whether there is any estoppel effect from the state court fact-finding may at some point need to be reached.

[13] This concern has led some Circuits to hold that the *Heck* bar does not apply to one who has no recourse to a petition for habeas corpus, reasoning that if *habeas* is unavailable to the plaintiff, the civil action is not a subterfuge to avoid the collateral attack.  Thus, for example, in *Cohen v. Longshore,* 621 F.3d 1311, 1316-17 (10th Cir. 2010), the plaintiff was an ICE detainee who had been transferred out of ICE custody, rendering any *habeas* challenging his detention moot.  Because he no longer had a

preclude parallel actions in the form of ongoing civil actions while a criminal prosecution was still pending; and the desire to avoid inconsistent results (a favorable civil action establishing unlawful defects in convictions still standing).

To avoid these unwanted situations, the Court crafted a rule that bars civil litigation that impugns the integrity of a criminal conviction *unless* the conviction has already been questioned.  It can be called into question by being "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Figueroa v. Rivera,* 147 F.3d 77, 80 (1st Cir. 1998).  Impugning the integrity of the conviction (or a sentence) means "imply[ing its] invalidity." *Thore v. Howe,* 466 F.3d 173, 179 (1st Cir. 2006).

In this case, Mr. Tempest contends that constitutional due process violations led to the conviction entered in 1995 following his trial.  *That* conviction, whose validity is (and, indeed, was) "called into question" by the claims in the instant civil action, *was* invalidated:  it was vacated by the Rhode Island Superior Court, and that ruling was upheld by the Rhode Island Supreme Court.  The conviction that remains

---

remedy in habeas corpus, the Tenth Circuit held that *Heck* was not a bar to a civil action.  *Id.,* 621 F.3d at 1317.  The First Circuit has been described as unsympathetic to this reasoning.  *Cohen* at 1315-16, citing *Figueroa v. Rivera,* 147 F.3d 77, 81 (1st Cir. 1998), which noted that there is no "equitable exception" to *Heck* in the case of the estate of a convicted felon who had died before being able to pursue a *habeas* petition challenging his conviction.  *Accord, Entzi v. Redmann,* 485 F.3d 998, 1003 (8th Cir. 2007) (if there is an exception to *Heck* for those without recourse to habeas corpus, it is for the United States Supreme Court to declare it).

was not the product of the constitutional infirmities Mr. Tempest complains of - it stemmed from an *Alford* plea whose integrity is not impugned by the civil action.

Several courts have assessed *Heck* in this context, where a first conviction allegedly resulted from constitutional violations for which the defendant-turned-plaintiff seeks civil recompense, but after which a second conviction was entered.  If the integrity of the second conviction is not impugned by the civil action, they have ruled, there is no *Heck* bar because the *first* conviction that *is* impugned had in fact been invalidated.  Where this has happened, a successful civil verdict does not even implicitly challenge the second conviction, the only one left standing.  There are no parallel ongoing proceedings which could result in inconsistent determinations.  And, finally, since the "tainted" conviction has already been vacated, it cannot be attacked by habeas corpus, so *Heck's* concern that the civil action not improperly substitute for a *habeas* petition is not implicated.

Support for this construct comes from a line of cases following *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc).  *Poventud* articulated that *Brady* claims "necessarily imply the invalidity of the challenged conviction in the trial (or plea) *in which the Brady violation occurred.*"  *Id.* at 132 (emphasis original).  In *Poventud*, where there was a conviction overturned and subsequent plea to a lesser-included offense, the Court held that the civil action was not inconsistent with a "clean conviction, untainted by the *Brady* violation associated with the 1998

17

conviction."[14]  *Id.* at 136.   A helpful analytic piece is that *Poventud* distinguished between civil actions focused on the *process* and those essentially challenging the outcome.  *Id.* at 138.

*Dennis v. City of Philadelphia,* 379 F. Supp. 3d 420 (E.D. Pa. 2019), adopted the *Poventud* reasoning and re-framed the inquiry in a two-conviction case into a helpful question:  would success in the civil action undermine one or both convictions?  If so, has the conviction that would be undermined been invalidated?[15]  In that case, the defendant had initially served twenty-five years on death row before ultimately pleading *nolo contendere* to a reduced charge.  Because the civil action, alleging due process and fair trial denials, bore only on the initial conviction and related to the "process" rather than ultimate guilt or innocence, the district court held there was no *Heck* bar.  *Id.* at 430.

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014), involves facts similar to those in *Poventud*.  The defendant was convicted of murder then, after reversal, he was convicted again at a trial at which the illegally obtained evidence was not used.  He sued for a violation of *Miranda*.  Although the Court noted he would likely be entitled only to nominal damages because of the subsequent conviction, it held the civil action

---

[14] Poventud was convicted of attempted murder and other crimes.  Those convictions were ultimately vacated, and he pled guilty to a lesser crime for time served.  He then sued for *Brady* violations.  The Circuit reversed the district court which had held the civil lawsuit *Heck*-barred.

[15] One district court has framed the question in an interesting way: "is there a "logical inconsistency" between the civil action and the conviction?  If so, the civil action is *Heck*-barred.  *Veneziale v Deichman,* C.A. No. 14-6015, 2018 WL 3122066, at *8 (D.N.J. June 25, 2018).

not *Heck*-barred. That conviction was already vacated when the Circuit had granted an earlier *habeas* petition, and a successful civil action would have no bearing on the second conviction. *Id.* at 760. *Easterling v. Moeller,* 334 Fed. App'x 22, 24 (7th Cir. 2009), is consistent, finding no *Heck* bar because the plaintiff's civil action claiming a Fourth Amendment violation did not imply the invalidity of a conviction produced by a guilty plea:  "[B]ecause Easterling was convicted following a guilty plea, 'the validity of that conviction cannot be affected by an alleged Fourth Amendment violation because the conviction does not rest in any way on evidence that may have been improperly seized.'" *Id.,* (quoting *Haring v. Prosise,* 462 U.S. 306, 321 (1983)).

The correctness of an analysis separating the two convictions in this kind of case and barring the civil action *only if* the conviction whose integrity is impugned has not been invalidated receives strong support from a First Circuit pre-*Poventud* opinion written by Chief Judge Sandra Lynch.  A second pre-*Poventud* opinion provides support for the idea that in a case like this the two convictions are not fungible, and the *Heck* analysis is not broad-brush but instead affects only those convictions "necessarily" impugned by the civil action. *Olsen v. Correiro,* 189 F.3d 52 (1st Cir. 1999), involved a civil rights lawsuit for damages for prosecutorial failure to disclose evidence.  After his murder conviction was overturned, the defendant pleaded to a charge of manslaughter in return for a sentence of time served.  The First Circuit held that the plaintiff could recover damages associated with the constitutionally bad murder trial and conviction, but not for the incarceration since that was supported by the untainted plea sentence. *Id.* at 69-70.  While *Olsen* focuses on the damages

claim, it upheld the award of damages for the consequences of the constitutionally infirm first conviction even though it had been followed by an untainted conviction based on a plea that was still intact.  Other Courts have held the same.  *E.g.*, *Taylor v. County of Pima,* 913 F.3d 930, 935 (9th Cir. 2019) (where plaintiff's 2013 conviction resulted in a plea and sentence to time served, he could not recover damages for unlawful conviction resulting from his 1972 subsequently vacated conviction).

While *Brady* cases analyzed under *Heck* are less frequent,[16] there is a strong line of cases adopting the *Poventud* reasoning where the civil action claims a constitutional violation unrelated to guilt or innocence.  In a pre-*Poventud* decision, the First Circuit held a § 1983 excessive force claim *not Heck*-barred.  The opinion in *Thore v. Howe*, was based on the same logic as *Poventud,* and reasoned that while a claim based on the contention that the plaintiff did not commit an assault at all *was* barred, an excessive force claim would be similarly precluded only if it were "interrelated factually" with the conviction.  466 F.3d at 180.[17]  A number of other courts have ruled consistently with *Thore* that success in an excessive force civil action would not impugn the integrity of the conviction since the excessive force claims concern independent police action occurring before the criminal proceedings.  *E.g.*, *Ballard v. Burton*, 444 F.3d 391, 399-400 (5th Cir. 2006) (excessive force);

---

[16] *But see Rosales-Martinez v. Palmer*, No. 3:10-cv-00748-MMD-VPC, 2017 WL 3710068 (D. Nev. Aug 28, 2017) (*Brady* civil claims not *Heck*-barred although a claim relating to the lawfulness of the sentence was).

[17] *Thore* noted but did not elaborate on Judge Selya's comment in *Figueroa, supra* at n. 12, that there is no "equitable exception" to *Heck.*

*Smithart v. Towery,* 79 F.3d 951, 953 (9th Cir. 1996) (claim that plaintiff arrested without probable cause barred by *Heck* but excessive force claim not); *Vangilder v. Baker,* 435 F.3d 689, 692 (7th Cir. 2006) (excessive force challenge may be maintained without implying the invalidity of the resisting arrest conviction). *Accord, Harden v. Pataki*, 320 F.3d 1289, 1298 (11th Cir. 2003) (actions challenging extradition are not related to guilt or innocence "and therefore do not impugn [the] conviction or sentence"); *Ove v. Gwinn*, 264 F.3d 817, 823 (9th Cir. 2001) (civil challenge to blood draw not *Heck*-barred where convictions were "*derive[d] from their pleas, not from verdicts obtained with supposedly illegal evidence.* The validity of their convictions does not in any way depend upon the legality of the blood draws.") (emphasis in original).

This view is supported by language in *Heck* itself which suggested that because of doctrines such as independent source or inevitable discovery a civil claim for unlawful search might not necessarily imply that the conviction was unlawful. *Heck v. Humphrey,* 512 U.S. at 487, n.7. *See Lockett v. Ericson*, 656 F.3d 892, 896-97 (9th Cir. 2011) (§ 1983 action for warrantless search not *Heck*-barred because the conviction was derived from a plea, not from evidence seized during search); *Moore v. Sims,* 200 F.3d 1170, 1171-72 (8th Cir. 2000) (no-probable-cause search claim not barred by *Heck* but claim that cocaine was planted was). The Supreme Court has called attention to the fact that it used the word "necessarily" deliberately in holding that actions are barred only if they "necessarily" call into question the lawfulness of a conviction still outstanding. *Nelson v. Campbell,* 541 U.S. 637, 647 (2004). In this

case, Mr. Tempest's claims are aimed at the first conviction, not the second and, therefore, they are not barred by *Heck.*

This would be the end of the matter and the due process claim of Count II could proceed unimpeded were it not for a limitations question.  While state law determines the applicable limitations period, federal law determines the accrual date.  *McIntosh v. Antonino,* 71 F.3d 29, 34 (1st Cir. 1995).  The defendants maintain that the due process action accrued when the first conviction was invalidated, removing any *Heck* bar.  That would mean an accrual date of either July 13, 2015, when the state PCR was granted or, at the latest, July 14, 2016, when the Supreme Court affirmed.  In either event, the limitations period would have expired at least 18 months before December 18, 2020, when this action was filed.  There is some support for this position in *McDonough v. Smith,* ___ U.S. ___, 139 S. Ct. 2149, 2158 (2019), which held that the statute of limitations in a lawsuit for fabricated evidence accrued when the criminal prosecution terminates in the plaintiff's favor "or a resulting conviction has been invalidated" within the meaning of *Heck.*  In that case, the acquittal marked the end of the prosecution.

Mr. Tempest maintains that the action did not accrue until the prosecution terminated with his *Alford* plea, conviction, and sentence to time served.  According to him, the action was filed one-day shy of the limitation's expiration.  *See* chronology, *supra* at Part I.

The pivotal question is whether *Heck* would have been a bar to filing this lawsuit after the first conviction was overturned but while the criminal charges were

still pending.  According to the Complaint, the state threatened to use at a second trial much of the very same infirm evidence that had caused the reversal in the first place.  (ECF No. 1, ¶ 250).  And, indeed, again according to the Complaint, the Superior Court had denied Mr. Tempest's motions in limine to exclude that evidence from the later prosecution.  Thus, Mr. Tempest argues, had a conviction resulted after a second trial, the civil action would "impugn" its validity and *Heck* would be a bar. He argues that he could not be expected to file this civil action until the possibility of that prospect no longer existed.[18]

At one time, there was some federal support for that position.  The Tenth Circuit had held that because *Heck* precludes a § 1983 claim relating to pending charges if a judgment in the civil action for the plaintiff would "necessarily imply the validity of any conviction or sentence that might result from prosecution of the pending charges," the civil action could not be brought until the criminal charges were disposed of.  *Beck v. City of Muskogee Police Dept.,* 195 F.3d 553, 557 (10th Cir. 1999), and its progeny.  That view, however, was undercut by *Garza v. Burnett,* 672 F.3d

---

[18] The Court is mindful of the fact that the state of the law with respect to *Heck* allows a situation to exist in which prosecutors who had committed or permitted the commission of violations of constitutional rights would be incentivized to continue prosecutions in order to protect themselves from the consequences of the earlier constitutionally infirm prosecution.  Instead of dismissing cases that should be dismissed they would instead benefit from forcing a plea, even an *Alford* plea, and threatening lengthy further prison in order insulate themselves from the consequences of their prior bad acts.  While the Court does not opine about whether that was the state of play in this case it is interesting to note that the prosecution's threat to use infirm evidence and seek more prison time had Mr. Tempest proceeded to trial certainly indicates that it may well have been the case here.  This systemic flaw, however, is one that cannot be resolved within the context of this case.

1217, 1218 (10th Cir. 2012), which recognized the holding of *Wallace v. Kato,* 549 U.S. 384, 388 (2007), that "*Heck's* bar and its principle of deferred accrual do not apply to anticipated conviction." The Seventh Circuit, in a post-*Wallace* decision has held that *Heck* is not a bar to a civil action if criminal proceedings are simply pending and there has yet been no conviction. *Jamison v. Urban,* 411 Fed. Appx. 919, 921 (7th Cir. 2011) (*Heck* delays accrual only when there exists a conviction or sentence that has not been invalidated; it does not bar suits that would call into question anticipated convictions.).

The First Circuit has not addressed this question, but it seems clear under *Wallace v. Kato* that Mr. Tempest's argument that he was precluded by *Heck* from bringing this action until September 18, 2017, when the case finally terminated, would not be successful.[19] The Court is thus constrained to hold that the cause of action accrued no later than July 14, 2016, and the three-year statute of limitations expired. The Motion to Dismiss Count II is therefore GRANTED.

---

[19] Had Mr. Tempest brought this action while the criminal charges were pending, it could have been stayed until such time as they were resolved, satisfying *Wallace v. Kato.* "[I]t is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended. If the plaintiff is ultimately convicted, and if the stayed civil suit would impugn that conviction, *Heck* will require dismissal; otherwise, the civil action will proceed, absent some other bar to suit." *Wallace,* 549 U.S. at 393-94. That course has been followed in this Circuit. *Crooker v. Burns,* 544 F. Supp. 2d 59, 65 (D. Mass. 2008) (civil action stayed).

### C.  Count III:  Civil Rights Conspiracy

A conspiracy to violate civil rights, actionable under 42 U.S.C. § 1983, consists of an agreement between two or more people to do an unlawful act or to commit a lawful act by unlawful means. *Sanchez v. Foley,* 972 F.3d 1, 11 (1st Cir. 2020).  In addition to the agreement, which must have a common purpose among the co-conspirators, a plaintiff must show that a deprivation of constitutional rights in fact occurred.  *Id.*  "To establish a civil rights conspiracy, a plaintiff must show 'not only a conspiratorial agreement but also an actual abridgement of some federally secured right.'"  *Id.* (quoting *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cit. 2001)).  The conspiracy is simply a construct by which persons who did not themselves commit the unlawful act may be held liable for it because they were co-conspirators. *Sanchez,* at 11.  "[A] conspiracy under section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out." *Id.*

The statute of limitations runs not from the date of the forging of the agreement, but parallel with the limitations period of the alleged deprivations of rights.  "In the context of a conspiracy to violate civil rights, the statute of limitations runs separately from each action constituting a civil rights violation that causes actual damage to the plaintiff." *Nieves,* 241 F.3d at 51.  In this case, Mr. Tempest has alleged that the conspiracy was pursued to maliciously prosecute him, coerce him, deprive him of liberty without due process, and to deprive him of access to courts and executive clemency.  All the specific acts alleged to have been taken in furtherance of

25

the conspiracy concern the investigation of the crime, the first trial, and the first conviction:  in short, the activities alleged to have been unlawful in Mr. Tempest's post-conviction relief action.  The substantive deprivation of rights, then, which the agreement was entered into to accomplish, occurred during *that* prosecution which resulted in the 1995 conviction.  Ordinarily, then, the three-year statute of limitations would have run.

If *Heck v. Humphrey* had barred the due process claim until the *Alford* plea in 2017, the conspiracy claim might not have accrued until then.  But for the same reasons that the *Heck* bar was removed at least by 2016 with the affirmance of the PCR, the limitations period had expired before this action was filed.  Therefore, this claim, insofar as it alleges a conspiracy to deprive of due process rights, is limitations barred and the Motion to Dismiss Count III is therefore GRANTED.

### D.  Count IV:  Failure to Intervene

A failure to intervene claim has three elements: (a) that there was in fact a substantive violation of a plaintiff's constitutional rights; (b) that a law enforcement defendant had the opportunity to intervene in order to prevent that violation but did not do so; and (c) that it was objectively unreasonable for the defendant to believe that the plaintiff's rights were not being violated.  *Ying Liv. City of New York*, 246 F. Supp. 3d 578, 619 (E.D.N.Y. 2017).  The acts alleged to support a claim that the defendants failed to intervene to stop the deprivation of rights all occurred during the investigation, prosecution, and trial the first time around.  They are spelled out in the Complaint:

    A.   Failing to intervene to prevent or stop the fabrication of witness statements by Ronald Vaz, John Guarino, Donna Carrier, Loretta Rivard, Sherri Richards, and Lisa Ladue.

    B.   Failing to intervene to stop the concealment and suppression of *Brady* material by AAG Ryan, including exculpatory statements by witnesses Donna Carrier, Kevin McMann, and John McMann.

(ECF No. 1, ¶ 295.)  It is not clear that *Heck v. Humphrey* would even apply to this claim, but if it did, it would not toll the statute of limitations for reasons expressed above.  Therefore, because all the acts comprising the alleged failure to intervene were committed well prior to December 17, 2017, the statute of limitations ran.  The defendants' Motion to Dismiss this Count is GRANTED.

### E.  Count V:  Municipal Liability

Mr. Tempest alleges that the City of Woonsocket is liable pursuant to the municipal liability doctrine of *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658 (1978).  *Monell* held that a municipality is liable for the actions of its employees only if the constitutional violations committed by the employees grew out of an official "policy or custom" of the municipality.  *Id.* at 694.  Municipalities are not liable for the actions of its tortfeasor employees by virtue of respondeat superior.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.*

In this kind of case, the plaintiff does not have to allege that municipal policy actively *directed* the failure to disclose exculpatory evidence, or trained police to encourage perjured testimony.  It is enough if the allegations make it "entirely

plausible that the [unconstitutional] conduct was encouraged, or at least tolerated, by the [municipality.]" *Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011). Alternatively, municipal liability may be based on a failure to properly train its officers, resulting in the commission of a constitutional tort. *Kennedy v. Town of Billerica,* 617 F.3d 520, 531-32 (1st Cir. 2010).

The statute of limitations applicable to a *Monell* claim against the municipality is not necessarily the same as that which governs actions against individuals in the employ of the municipality.

> Since an actionable claim under § 1983 against a county or municipality depends on a harm stemming from the municipalities 'policy or custom,' … a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom.'"

*Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995).[20]

In *Ouellette v. Beaupre,* 977 F.3d 127 (1st Cir. 2020), the statute of limitations had run against the police officer who allegedly committed sexual assault on the plaintiff. The Circuit held, though, that it did not even *begin* to run until social media postings many years later gave the plaintiff reason to learn of the City's deliberate indifference to allegations of sexual assault by members of the police force. *Id.* at 133. Here, Mr. Tempest contends that the conduct that could lead to *Monell* liability

---

[20] Although *Lawson v. Rochester City School Dist.,* 446 Fed. Appx. 327, 329 (2d Cir. 2011), cast some doubt on the viability of *Pinaud,* it was specifically cited recently by the Second Circuit which also quoted the same language. *Birch v. City of New York,* 675 Fed. Appx. 43, 45 (2d Cir. 2017).

against the City of Woonsocket occurred during the investigation and direct prosecution, leading up to the 1995 conviction

> The City of Woonsocket, by and through its final policymakers, *during the time of Mr. Tempest's wrongful arrest and conviction, and for years beforehand,* failed to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers in connection with the fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence.

(ECF No. 1, ¶ 300) (emphasis supplied).   Mr. Tempest certainly learned of the prosecutorial misconduct itself during the litigation of his post-conviction relief application.   Under *Ouellette,* however, he had to have either known of, or had reason to inquire about, whether the City of Woonsocket through its official policy or practices facilitated, encouraged or otherwise "condon[ed] the alleged constitutional violation."   *Ouellette,* 977 F.3d at 140.   The employment relationship between culpable police officers and their municipal employer is, by itself, not sufficient to put a wronged plaintiff on notice of the causal link between the injury and the conduct of the municipality.

In *Ouellette,* the record concerning the plaintiff's knowledge was sufficient to establish a factual issue for a jury concerning the time when the plaintiff's knowledge would have caused the right of action against the City to accrue.   In the instant case, there are no factual allegations in the Complaint that would allow the Court, at this juncture, to determine when the plaintiff gained sufficient knowledge of the municipal policies he alleges, or even knowledge that would give rise to a duty to inquire.   Discovery may produce that information, and the plaintiff is entitled to the

29

opportunity to engage in it to demonstrate that he filed this action within three years of the accrual of the claim.  The Motion to Dismiss Count V is DENIED.

### F.  Count VI:  Abuse of Process – Count IX Respondeat Superior

The abuse of process claim is brought purely under state law.  In Rhode Island, the tort has two elements:  that the defendant instituted proceedings against the plaintiff and that the proceedings were used by the defendant for a perverted purpose that they were not designed to accomplish.  *Fiorenzano v. Lima,* 982 A.2d 585, 590 (R.I. 2009).

Abuse of process is a personal injury concept, *Pickering v. American Employers Ins. Co.,* 282 A.2d 584, 588 (R.I. 1971), and the three-year statute of limitations of R.I.G.L. § 9-1-14(b) therefore applies.  Were Mr. Tempest alleging that the criminal proceedings were tortious at their inception, manifested by his indictment in 1991, the statute of limitations would have run long before he filed this action in 2020.  *See Phoenix v. Day One,* No. 1:20-cv-152-MSM-PAS, 2021 WL 4193197, at *1 (where allegation was that proceedings were instituted maliciously, abuse of process action accrued when misdemeanors were charged).  Rhode Island has not explicitly declared when an abuse of process action accrues, but the Rhode Island Supreme Court has said it "arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed." *Hillside Assoc. v. Stravato*, 642 A.2d 664, 667 (R.I. 1994).

The language from *Hillside* makes clear that an abuse of process claim can, and might well, accrue at some point *after* the proceedings had been initiated – i.e.,

at some point during the prosecution.   In this way it differs from malicious prosecution which focuses on the motivation of the proceedings at their inception and alleges that the very commencement of the prosecution was tortious.   As one state court aptly put it, "the distinction between malicious prosecution and abuse of process is that malicious prosecution requires a claim to be improperly instituted, whereas abuse of process requires a wrongful or improper act after the institution of process." *Fox v. City of Greensboro*, 866 S.E.2d 270, 290 (N.C. App. 2021).

Mr. Tempest, in his Objection to the Motion to Dismiss, does not identify a date when he maintains the abuse of process action accrued.   Instead, he argues that "in fairness," he should not have been required to pursue it until the criminal charge was finally disposed by his *Alford* plea on December 18, 2017.   If that were true, his Complaint, filed on December 17, 2020, would be timely.   (ECF No. 17, p. 23.)   But he offers no legal support at all for what would be a blanket "equity" exception to the statute of limitations, much less support in Rhode Island law.[21]   The Court, on its own, cannot begin to pinpoint when in the course of these events an inference of improper purpose could be drawn:   When the prosecution began?   When the prosecution twisted and manipulated the evidence by use of suspect testimony and concealment of exculpatory material to unfairly gain advantage resulting in a conviction?   When the state refused to *nol pros* the indictment after Mr. Tempest's post-conviction relief application was granted in the Superior Court or after the

---

[21] Rhode Island law does recognize "equitable tolling" of a statute of limitations in very narrow circumstances. *Rivers v. American Com. Ins. Co.,* 836 A.2d 200, 204 (R.I. 2003).

successful appeal?  If any of these events, all occurring before December 17, 2017, provided a basis to claim a perversion of the prosecution, Mr. Tempest's abuse of process claim would be time-barred.  *See Watson v. Mita*, C.A. No. 16-40133-RSH, 2017 WL 4365986, at *4 (D. Mass. Sept. 29, 2017) (abuse of process accrued "at such time as the criminal process is set in motion against the plaintiff, or when the plaintiff was aware that 'such process was employed for an inappropriate collateral objective'" (quoting *Duamutef v. Morris,* 956 F. Supp. 1112, 1118 (S.D.N.Y. 1997)); *Wilson v. Town of Fairhaven,* No. 18-110990PBS, 2019 WKL 1757780, at *8 (D. Mass. March 4, 2019), R&R adopted 2019 WL 1760591 (D. Mass. March 19, 2019).

On the other hand, Mr. Tempest alleges that up to the actual *Alford* plea itself, the state was maintaining that if he were convicted a second time it would recommend an eighty-five-year sentence *and* object to his being paroled for the rest of his natural life.  In addition, he alleges that the state intended to use, at this second trial, evidence that was tainted by its misconduct in the investigation[22] and he suggested that the state's misconduct "may be ongoing."[23]  (ECF No. 1, ¶ 248, 249.)  The threat alone, if made, would presumably have been for the purpose of persuading Mr. Tempest to enter a plea to the charge and not insist on standing trial again.  Mr.

---

[22] *See* ¶¶ 249-250 of Complaint (ECF No. 1).  Mr. Tempest brought pretrial motions to exclude the evidence that was related to prosecutorial misconduct from his second trial.  Presumably the state objected, as two of the motions were denied.  Decision on the Motion to exclude testimony about the maroon car was deferred.  *Id.*

[23] In ¶ 248 of his Complaint, Mr. Tempest alleges discovery in 2017 of information from the state that may have indicated testimony in a 2014 deposition was manipulated.  (ECF No. 1.)

Tempest has not specifically alleged that the state was motivated by a desire to avoid paying civil damages for what both the state Superior and Supreme Courts had found by that time were constitutional violations, but it is conceivable that the inference could be drawn if an evidentiary basis for it were developed during discovery.[24]   If Mr. Tempest only became aware of such an improper motive then, the cause of action would have accrued at that time.   *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 616 (E.D.N.Y. 2017) (claim for abuse of process did not accrue until plaintiff became aware that police had a collateral motive of inducing her husband to plead guilty). "[A]ccrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim."   *Duamutef v. Morris,* 956 F. Supp. 1112, 1118 (S.D.N.Y. 1977) (Sotomayor, J.).

In his complaint, Mr. Tempest included only the following in the Count alleging abuse of process: "Defendants initiated proceedings against Mr. Tempest and used these proceedings for a wrongful purpose that the proceedings were not designed to accomplish:  the wrongful arrest, prosecution, and conviction of Mr. Tempest, an innocent man."  (ECF No. 1 ¶ 304.)  The act or acts constituting abuse of process,

---

[24] Citing treatises, a Missouri appellate court has reasoned that the statute of limitations on an abuse of process claim "begins to run[,] from the termination of the acts which constitute the abuse complained of, and not from the completion of the action in which the process issued."  *Corley v. Jacobs,* 820 S.W.2d 668, 672 (Mo. App. 1991) (citing 1 ALR3d, Abuse of Process-Limitations statute, pp. 953-54 (1965) and 72 C.J.S. Process, § 112 (1987).

then, are implied to be the prosecution leading up to the first conviction.[25]   By definition, then, the acts would have occurred prior to January 11, 1995, the date his first conviction was affirmed on appeal and reduced to final judgment.   By that measure, the statute of limitations has run.

If the threat to again seek an eighty-five-year sentence or oppose parole forever formed a part of the abuse of process alleged, the Court might well decide at this early stage, without a fuller development of the record, that it cannot say that the statute of limitations has expired on the abuse of process claim.   But Mr. Tempest has not alleged in his Complaint any conduct by the two individuals he sued that influenced the state's determination to retry him.   Nor, when he refers to the state's threat to object to his parole for the rest of his life were he to turn down the plea option, are there any facts alleged that would give rise to an inference of Woonsocket participation in that decision.   The complaint speaks of "the state" and names only the state prosecutor.[26]   (ECF No. 1, ¶¶ 255-257.)   Thus, even if the abuse of process claim can withstand a statute of limitations defense because it relates to a perversion of the prosecution occurring in 2017, Mr. Tempest has not pleaded any liability on the part of the defendants he has actually sued for that distortion of the judicial process.   Therefore, the defendants' Motion to Dismiss Count VI is GRANTED, but

---

[25] "[Wrongful] conviction" can only refer to the first, vacated conviction since the second conviction was the product of a voluntary plea and not, presumably, considered "wrongful" by the plaintiff.

[26] *See, Suitor v. Nugent,* 199 A.2d 722, 724-25 (R.I. 1964) (Attorney General, in enforcing criminal law, performs a quasi-judicial function entitling him to immunity from suit for malicious use of process).

the plaintiff is permitted thirty (30) days in which to amend his complaint to reflect a cause of action against persons sued that comes within the embrace of the three-year statute of limitations.   That portion of Count IX which alleges respondeat superior liability on the part of Woonsocket for abuse of process committed by its employees must follow the same course.

### G. Count VIII:  Intentional or Reckless Infliction of Emotional Harm

As is the case with Mr. Tempest's abuse of process claim, a three-year statute of limitations, accorded by state law, applies to the intentional or reckless infliction of emotional distress.  *See Pirri, v. Toledo Scale Corp.,* 619 A.2d 429, 431 (R.I. 1993) (limitations period of three years pursuant to R.I.G.L. § 9-1-14 applies to all "injuries to the person").   Under Rhode Island law, a cause of action for infliction of emotional distress accrues when the physical symptomatology required to maintain that cause of action manifests.  *Hill v. Rhode Island State Employees' Retirement Bd.,* 935 A.2d 608, 617 (R.I. 2007) (complaint alleged "physical hardships," including acid reflux, occurring as early as his indictment).  Physical symptomatology is required for both intentional *and* reckless infliction of emotional distress, *Reilly v. United States,* 547 A.2d 894, 899 (R.I. 1988), and it is only logical that where the statute of limitations is the same for each the point of accrual would be the same.  In his complaint, Mr. Tempest alleges no physical symptomatology.[27]   In any event, the injury – the distress, assuming it was recoverable – must have occurred no later than the first

---

[27] The defendants have not moved for dismissal on this basis.

conviction.[28]   The Rhode Island Supreme Court has rejected applying a rule of reasonable discovery to this cause of action, *Hill,* 935 A.2d at 617, but even if it did apply, the plaintiff clearly knew of the cause of the distress (the defendants' malfeasance) by the time he filed his application for post-conviction relief.  Whatever the event that began the running of the limitations period on an emotional distress claim, it happened more than three years before the filing of this action.  Therefore, Count VIII must be DISMISSED.

### H.   Count IX - Respondeat Superior Liability

A municipality, in this case the City of Woonsocket, is liable for the intentional tortious conduct of its employees if the misconduct falls within the scope of the employment.  *Cruz v. Town of North Providence,* 833 A.2d 1237, 1240 (R.I. 2003).  Its liability under this doctrine is purely vicarious:  it is held responsible not for its own conduct but for the employees' conduct.  While it may be debated whether the misconduct at issue was carried on within the scope of law enforcement employment, the simpler response at this point to this cause of action is that it must follow the disposition of the torts alleged in Counts IV, VI, and VII.

---

[28] Mr. Tempest's complaint recites a list of adversities he suffered in connection with his claim for damages.  (ECF No. 1, ¶¶ 271 – 274.)  He suffered "the loss of his freedom for more than twenty-three years, pain and suffering, mental anguish, emotional distress, indignities, degradation, and restrictions on all forms of personal freedom, …"   In addition, he was "deprived of his familial relationships," and "sustained economic injuries and damages, including loss of income and loss of career opportunities."  *Id.*  All these injuries occurred, at the latest, at the time of the first conviction and incarceration.

## IV.   CONCLUSION

"The primary responsibility of a prosecutor is to seek justice, which can only be achieved by the representation and presentation of the truth." *National Prosecution Standards* (3rd ed.), promulgated by the National District Attorneys Association, Standard 1-1.1.   https://ndaa.org/wp-content/uploads/NDAA-NPS-3rd-Ed.-w-Revised-Commentary.pdf.   The ultimate responsibility for the integrity of the evidence presented belongs to the prosecution.   *Id.* at Std. 3-1.3.

In this case, members of the Woonsocket Police Department laid a track heavily infested with lies; the state prosecution not only provided the rails but led the jury down it to obtain a conviction that was so suspect and so much a result of misconduct that it was vacated by the state courts.   That relief, however, gives meaning to the phrase "too little, too late."   While Judge Procaccini's decision released Mr. Tempest from confinement, it could not compensate for what he had lost: [29]

> During the almost 24 years he spent in prison, Mr. Tempest's daughters—who were minors in his full custody at the time of his 1992 trial—grew up and had families of their own.   While wrongfully incarcerated, Mr. Tempest missed out on events and memories that could never be recreated: walking his daughters down the aisle at their weddings; being present for the births of his beloved grandchildren; and celebrating holidays and birthdays with his family and friends.

---

[29] In this case, Mr. Tempest was sentenced to time served following the *Alford* plea, so the imprisonment that was imposed on him was, strictly speaking, a consequence of the plea.   Whether he could recover for injuries caused by that imprisonment, even if there were no other bars to recovery, might be doubtful, but he could recover for injuries that resulted from the first trial and conviction.   *Olsen,* 189 F.3d at 69-70.

(ECF No. 1, ¶ 262.)  Unfortunately, this Court can neither compensate him for, nor permit him to go forward with, most of his claims in his attempt to hold those responsible civilly accountable.

The Motion to Dismiss (ECF No. 12) is GRANTED as to all Counts except Count V, with the proviso that the plaintiff has thirty (30) days in which to amend his claim for abuse of process so that it does not fail because of an expired statute of limitations.

IT IS SO ORDERED:

Mary S. McElroy,
United States District Judge

July 19, 2022