## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| | ) | |
| RAYMOND D. TEMPEST, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-00523-MSM-LDA |
| | ) | |
| RODNEY REMBLAD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This Order is the latest chapter in a contested civil rights case with underlying facts beginning in 1982.  Before the Court is the Defendants' Renewed Motion to Dismiss (ECF No. 65).[1]  This Motion follows the close of limited discovery on "what involvement, if any, each Defendant had with the re-prosecution of Mr. Tempest from the time when the post-conviction relief application was granted in Superior Court up until the Plaintiff's plea on December 18, 2017."  (ECF No. 41 ¶ 1.)

As explained below, the Defendants' Motion is GRANTED.

## I.    BACKGROUND

The Court assumes the reader's familiarity with its past decision providing the relevant, often sordid, background to this case.  *See, e.g.*, ECF No. 26 at 3–5.  It moves

---

[1] The Defendants' Motion incorporates by reference past, related motions.  (ECF No. 31, No. 31-1, No. 38, No. 61, No. 62.)

directly into the discussion and, as necessary, weaves into that discussion the facts uncovered in discovery.

## II.    LEGAL STANDARD

Though the Defendants have moved to dismiss under Rule 12(b)(6), a different standard now governs.  Under Rule 12(d), the Court must convert the Defendants' Motion to Dismiss (ECF No. 65 and the previously incorporated motions) into a Motion for Summary Judgment to consider the evidence that the parties supplied following the close of limited discovery.  Fed. R. Civ. P. 12(d).  The exhibits that the parties cite in their briefs—particularly the depositions and interrogatories—cannot be considered on a motion to dismiss.  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) ("Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56").  Because the parties have conducted limited discovery into the remaining issues and have relied on and provided the Court with the relevant exhibits, the Court sees Rule 12(d)'s requirement that the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion" as already satisfied.  Fed. R. Civ. P. 12(d).  At the hearing, the parties all agreed with the Court about this conclusion.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a

fact is material "if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). But "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A moving party is entitled to judgment as a matter of law if "no reasonable jury would favor the nonmoving party." *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025). "The evidence of the non-movant," here Mr. Tempest, "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

After the Court's order dismissing most counts (ECF No. 26) and Mr. Tempest's submission of an Amended Complaint (ECF No. 28), three counts remain. Count I asserts municipal liability under 42 U.S.C. § 1983 against the City of Woonsocket for its failure to properly train and supervise Mr. Pennington and Mr. Remblad during the relevant period. (ECF No. 28 ¶¶ 275–79.) Count II is a Rhode Island state-law abuse of process claim against all the Defendants, asserting that they were involved in and heavily influenced (1) the original prosecution of Mr. Tempest in the 1980s and 1990s, (2) the second prosecution that began after the Rhode Island Supreme Court vacated his conviction in 2016, and (3) the threat that the Attorney General's Office issued to Mr. Tempest to pursue an 85-year sentence and oppose parole forever if he did not take the *Alford* plea offered. *Id.* ¶¶ 280–306. Count III is a respondeat superior claim against the Woonsocket Police Department ("WPD") and the City of Woonsocket for those same actions. *Id.* ¶¶ 307–10.

## A.     Count II: Abuse of Process

The Court starts with Count II, the abuse of process claim.  The Defendants make three main arguments: (1) that the Amended Complaint does not relate back to the Original Complaint, (2) that the limited discovery did not yield any evidence to support the abuse of process claim, warranting judgment in their favor, and (3) that the statute of limitations bars the claim anyway.  The second argument proves dispositive.

### 1.     Relation Back

The Defendants first argue that the Amended Complaint (filed in 2022) cannot relate back to the Original (filed in 2020), mainly because the two documents lack the necessary "common core of operative facts" for relation back to apply.  *Mayle v. Felix*, 545 U.S. 644, 664 (2005).  In their view, the original claim arose from the Defendants' conduct "in the murder investigation, the original prosecution, and the first conviction—conduct that took place in the 1980s and 1990s," while the amended claim focuses on their "alleged influence in the decision to re-try Plaintiff in 2017— completely different conduct of which the original complaint makes absolutely no mention."  ECF No. 31-1 at 9; *see also* ECF No. 38 at 2–7.[2]

Rule 15 establishes that an amendment to a pleading "relates back to the date of the original pleading" when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in

---

[2] When citing to the parties' briefs and record evidence, the Court refers to the ECF pagination at the top of the page, rather than the parties' pagination.

the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Courts "liberally apply" the relation back doctrine. *Buerman v. Witkowski*, No. 1:17-cv-00444-MSM-LDA, 2020 WL 1083681, at *2 (D.R.I. Mar. 6, 2020) (collecting cases).

Here, the Amended Complaint relates back because the Original Complaint and the Amended Complaint focus on the same "conduct" or "occurrence," what Mr. Tempest describes as "the threat to seek a reimposition of the 85-year sentence and forever oppose parole if Mr. Tempest did not take an *Alford* plea." (ECF No. 36 at 19.)

A side-by-side comparison of the complaints shows as much. *Compare* ECF No. 1 ¶¶ 255–263 *with* ECF No. 28 ¶¶ 255–263, 292–96, 303–304. The Original Complaint generally discusses the Attorney General's Office's behavior in the lead-up to the *Alford* plea. (ECF No. 1 ¶¶ 255–58.) The Amended Complaint builds on that by explaining the Defendants' involvement personally and through the WPD. (ECF No. 28 ¶¶ 255–263, 295–97.) The Original Complaint also refers to "the State's threats" in the lead-up to the *Alford* plea, as well as the production of "evidence newly 'developed' by the WPD that was as tainted and unreliable as the evidence that led to his prior conviction." (ECF No. 1 ¶ 263.) The Amended Complaint adds more to that. (ECF No. 28 ¶¶ 263, 282–96.)

So, the matters "raised in the amended pleading" were indeed "given to the opposing party" via the "general fact situation alleged in the original pleading." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (cleaned up); *see also Buerman*, 2020 WL 1083681, at *3–4. Put differently, the amendments "do no more than restate the original claim with greater particularity or amplify the details of the

transaction alleged in the preceding pleading," so application of the relation back doctrine is appropriate. 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Procedure § 1497.

The Court thus holds that the Amended Complaint relates back to the Original.

### 2.   Abuse of Process Claim

The Court proceeds to the merits. To prevail on his abuse of process claim, Mr. Tempest must show: "(1) that the defendant instituted proceedings or process against the plaintiff and (2) that the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish." *Fiorenzano v. Lima*, 982 A.2d 585, 590 (R.I. 2009) (cleaned up).

As another court in this district has explained, the improper purpose element under Rhode Island law is no low bar. "An improper purpose generally means a form of coercion to obtain a collateral advantage which turns the proceeding into a form of extortion. Neither a pure spite motive, nor an action taken principally to harass and annoy are sufficient, if the purpose of the proceeding is otherwise valid." *T.J. by & through Johnson v. Rose*, 615 F. Supp. 3d 115, 124 (D.R.I. 2022) (cleaned up); *see also* Restatement (Second) of Torts § 682 (1977) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose . . . Thus the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm.").

The Defendants argue that the evidence uncovered during discovery shows that Mr. Tempest cannot prove the claim against Mr. Pennington, even if everything Mr. Tempest provided is accepted as true.[3]  First, they say that Mr. Pennington is a private citizen, and private citizens cannot, as a matter of law, be held liable for abuse of process arising from a criminal prosecution with rare exceptions.  (ECF No. 31-1 at 16–18.)  Second, they contend that discovery has shown that those rare exceptions do not apply here: Mr. Pennington "had no role in the decision to re-charge Tempest in 2016" and "no role in the decision to offer or accept the *Alford* plea." (ECF No. 62 at 6–11.)  Third, even if Mr. Pennington was involved enough to incur liability, they submit that he lacked an ulterior motive, a necessary element of the claim.  *Id.* at 9.

The Court starts with the first argument: that Mr. Pennington, as a private citizen, can be held liable for a Rhode Island state-law abuse of process claim arising from a criminal prosecution.  (More on whether he is really a "private citizen" later.) This question bears on the first element: whether a private citizen can really "institute" criminal "proceedings" against the plaintiff if he lacked the power to start the proceeding himself; it also bears on whether the defendant could himself have "perverted" the process.  *Fiorenzano*, 982 A.2d at 590.  More simply, the question is: what level of involvement must a private person have with the criminal process to say that they "instituted proceedings" or "perverted" them against the plaintiff?

---

[3] Following the 2024 death of Mr. Remblad, Mr. Tempest has stipulated to dismissing the claim against him.  And for Mr. Tempest to succeed against Woonsocket based on respondeat superior, there must be a viable underlying claim.

The Rhode Island Supreme Court has not directly answered that question. Still, the caselaw offers some hints. In *Hoffman v. Davenport-Metcalf*, the Rhode Island Supreme Court affirmed dismissal of an abuse of process claim arising from criminal complaints, noting that "the police department," rather than the abuse of process defendant, "filed criminal complaints." 851 A.2d 1083, 1090 (R.I. 2004). Even so, the court's reasoning hinged less on that fact than the defendant's good faith in contacting the police. *Id.* at 1090-91. (noting that the defendant "had sufficient grounds to contact the police"). More directly, the Rhode Island Supreme Court has repeatedly stated that it views "abuse-of-process actions with disfavor" because "they tend to deter the prosecution of crimes and/or to chill free access to the courts." *Butera v. Boucher*, 798 A.2d 340, 354 (R.I. 2002) (collecting cases). That well-established principle forces the Court to hesitate before expanding the cause of action unnecessarily.

Recognizing the dearth of Rhode Island caselaw, the parties collectively cite a smattering of state and federal cases on the subject. *See, e.g.*, ECF No. 31-1 at 16–17; ECF No. 36 at 27–28; ECF No. 38 at 14–15. Because there is no on-point precedent and the claim is historically disfavored, the Court probes this caselaw to try to extract the most persuasive reasoning.

Mr. Tempest argues that liability should be evaluated based on the extent that the defendant "controlled or influenced the challenged process." (ECF No. 36 at 27.) He draws largely from *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 617–18 (E.D.N.Y. 2017). There, a federal district court rejected the argument that police

officers and medical examiners are exempt from abuse of process claims because they lack "the authority to offer and/or to induce defendants to accept plea deals." *Id.* In part, that was because the defendants did not provide "any legal authority for this contention." *Id.* at 618. More importantly, the court stated that it was "unclear" why "the police officers and medical examiners would not be liable if they worked with the prosecutors to pursue Plaintiff's prosecution for the purposes of getting Plaintiff's husband to plead guilty or covering up an unlawful arrest." *Id.*

Mr. Tempest next cites *Vodrey v. Golden*, 864 F.2d 28, 30 (4th Cir. 1988) (Powell, J.). There, the Fourth Circuit upheld a North Carolina state-law abuse of process claim against private individuals where they "actively participated" in a criminal prosecution related to a collateral property dispute. *Id.* at 30. The defendants "conferred with the district attorney" prosecuting the plaintiff, and the defendant "voluntarily testified" at the trial; to boot, the prosecutor testified (in the civil action) that the defendants' attorney "told him of the pending civil suit, encouraged him to press the criminal prosecution, and indicated it was important to have the criminal offenses or alleged criminal offenses tried." *Id.* (cleaned up).

Mr. Tempest also relies on *Weststar Mortg. Corp. v. Jackson*, 133 N.M. 114, 121 (N.M. 2002). There, he says that the Supreme Court of New Mexico held that the right test is whether the defendant "placed any pressure" on the authorities, at least in the parallel tort context of "initiation of proceedings." (ECF No. 36 at 28 (quoting *Jackson*, 133 N.M. at 121)). Yet the Court reads that case differently: the *Jackson* court's analysis was not whether the defendant placed "any pressure" on the

authorities, but whether that pressure "was the determining factor in the official's decision to commence the prosecution." *Id.* (quoting *Hughes v. Van Bruggen*, 44 N.M. 534, 538–39 (N.M. 1940)). It just happened that the case was particularly clear: the plaintiff "presented no evidence that Weststar placed any pressure on the authorities." *Id.*

Finally, Mr. Tempest cites *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1292 (11th Cir. 2001). Interpreting Alabama law, the Eleventh Circuit held that a defendant company was entitled to judgment as a matter of law on an abuse of process claim. *Id.* The plaintiffs alleged that a defendant company "had used a criminal search warrant to gather information for a civil suit against the plaintiffs." *Id.* at 1291. But the claim failed for several reasons. "Nothing in the record" stated that the company "controlled or influenced, or even participated in, the decision to seek and execute" a search warrant, and no representative "was present for either the procurement or execution of the warrant." *Id.* at 1292. Further, all the information for the warrant "was gained from the AG's own interviews." *Id.* "Most importantly, the chief investigator unequivocally denied that" the company "was involved in, or had knowledge of, procurement of the search warrant," and the plaintiff "presented no evidence to rebut or impeach this sworn testimony." *Id.* And, as the Defendants here observe, the Eleventh Circuit stressed that "the challenged process must be a judicial one, that is the search warrant—not the AG's investigation." *Id.*

For their part, the Defendants rely largely on a Virginia intermediary appellate court decision, *Harris v. USAA Cas. Ins.*, 37 Va. Cir. 553, 1994 WL

16040308 (Va. Cir. Ct. 1994). In *Harris*, an abuse of process claim failed when the defendants, private citizens, only attended and testified at a trial. 1994 WL 16040308, at *13. The court began by explaining that "ordinarily, only a law enforcement officer or Commonwealth's Attorney or other prosecutor can use the process issued in a criminal prosecution." *Id.* "A private person or firm" in contrast, "cannot be liable for abuse of process arising out of a criminal prosecution, short of an attempt to usurp the powers of law enforcement." *Id.* And in *Harris*, the "gist of the plaintiffs' allegations as to defendants' actions on the arson charge involve the procurement or setting in motion of the charge; there is no specific act other than testifying and attending trial that occurs after the warrants are secured." *Id.*

The Defendants urge the Court to adopt the *Harris* rule: that a "private person or firm cannot be liable for abuse of process arising out of a criminal prosecution, short of an attempt to usurp the powers of law enforcement." *Id.; see also* ECF No. 38 at 14–15. From that, the Defendants argue that if the standard is lowered and only "active participation or pressure from private individuals" is necessary to sustain a claim, the "cause of action would collapse on itself." (ECF No. 38 at 15.) After all, an "essential element" is proving the "perversion" of the process, "which can only be done by someone that wields control over the process." *Id.* A "mere participant," in the Defendants' view, "does not demonstrate the requisite capacity to pervert the process." *Id.*

Further complicating the case is Mr. Pennington's quasi-private, quasi-public status. On the one hand, he was a retired police officer rather than an active-duty

one; on the other, he charged time spent investigating the case in 2017 to the City of Woonsocket. (ECF No. 64-8 at 11–12.) That puts him closer to the "process" (more on what that means momentarily) than the *Harris* or *Tieco* defendants but also further than the *Ying Li* defendants.

But the Court need not decide the thorny legal question raised here, because even if the Court adopts Mr. Tempest's perspective and focuses just on the "influence and participation," rather than "control or usurpation," the Court is unconvinced that Mr. Pennington's "influence and participation" was enough to make out a claim. That is true even as the Court views "the entire record in the light most hospitable to" Mr. Tempest, "indulging all reasonable inferences in" his "favor, but paying no heed to conclusory allegations, improbable inferences, or unsupported speculation." *Quintana-Dieppa*, 130 F.4th at 7 (cleaned up).

To make sense of the record, the relevant period should be divided into three parts: the decision to re-charge, the pretrial planning, and the *Alford* plea ordeal. While Mr. Tempest has provided plenty of evidence about Mr. Pennington's involvement in pretrial planning, the Court sees no evidence to suggest his involvement in the decision to re-charge Mr. Tempest or, more importantly, the decision to issue the coercive threat about the *Alford* plea. Absent either of those, the Court cannot see how Mr. Pennington "instituted" the proceedings (because the proceedings were already instituted by the time he was really involved again) or how he "perverted" the process (because he played no role in issuing the threat related to the *Alford* plea). *Fiorenzano*, 982 A.2d at 590. Both elements are thus unsatisfied.

To start, Mr. Tempest has produced no evidence that Mr. Pennington played a role in the Attorney General's decision to re-try Mr. Tempest. The pre-charging conversations that Mr. Tempest highlights as evidence of Mr. Pennington's continued involvement in the case—Assistant Attorney General ("AAG") Christopher Bush's communications with Mr. Pennington in August 2015 and July 2016—are not probative of the point.

AAG Bush's deposition showed that in August 2015, he "spoke with" Mr. Pennington only to "let him know about the bail decision and the home confinement." (ECF No. 64-15 at 4.) AAG Bush's July 15, 2016, email similarly is unconvincing about Mr. Pennington's involvement in the decision to re-try Mr. Tempest. (ECF No. 64-16 at 2.) In fact, the email expressly disclaims the point. After Mr. Pennington said that he "was interested in what the next steps were," AAG Bush "explained" to Pennington "that we [meaning those in the Attorney General's Office] would likely sit down *internally* in the next couple of weeks to discuss what our next steps would be" and that afterward, they "would be in touch" with Mr. Pennington. *Id.* (emphasis added). That phrase left little room for Mr. Pennington's input. *See also* ECF No. 61-2 at 117–118 (unimpeached, unrebutted deposition testimony from AAG Bush stating that Mr. Pennington did not "have any influence at all in [his] decision to retry" Mr. Tempest).

But after Mr. Tempest was re-charged, Mr. Pennington played a role in the pretrial planning. As the Court sees it, these are the relevant facts showing his involvement:

- In January 2017, AAG Bush asked Detective Steve Springer: "When you catch up with Pennington about his brother-in-law, would you please ask if there are any pro-Tempest individuals who may not be as pro-Tempest now?" (ECF No. 64-17.) No information came from it. (ECF No. 64-15 at 8.)

- On May 2, 2017, several lawyers from the Attorney General's Office met with Mr. Pennington "to review facts of the case and information Sgt. Pennington may have." (ECF No. 64-18 at 2; No. 64-19.)

- Soon after that, Mr. Pennington met with former Woonsocket Police Detective Marc Baillargeon at least twice—once alone, and once with AAGs Bush and Jeanine McConaughey, as well as Detective Thomas Gormley. They did so to investigate Mr. Baillargeon's claims about a potential new witness, but nothing came of it. (ECF No. 64-8 at 9–11.) Mr. Pennington was paid by the City of Woonsocket for that work. *Id.* at 11.

- In May 2017, Mr. Pennington also identified Richard Picard as a potential witness, spoke with him, coordinated a conversation between him and Detective Gormley, and was paid for that work. (ECF No. 64-8 at 11–12.)

- In June 2017, Mr. Pennington provided contact information about another witness, Richard Marquis, to Detective Gormley at the Detective's request. (ECF No. 64-27 at 2.)

- In August 2017, AAG Patrick Youngs discovered that Mr. Pennington had spoken with one witness about the substance of another's testimony, reviving old concerns about Mr. Pennington's improper witness coaching

tactics.  (ECF No. 64-12 at 11–12.)  AAG Youngs described this as a "low point" in the case, given that Pennington did it "right under our nose."  *Id.* at 12; *see also* No. 64-29 at 2.  He told Pennington to "knock it off."  (ECF No. 64-12 at 15.)

- In late September 2017, Mr. Pennington left a voicemail for Detective Gormley identifying another potential witness.  (ECF No. 64-28 at 2.)

- In October and November 2017, AAG Youngs spoke to Pennington at least twice, based on Youngs' desk calendar notes.  (ECF No. 64-32 at 4–5.)

Those facts show Mr. Pennington's involvement, some of it deeply inappropriate, in the preparation for the retrial.

But that evidence has little to do with the actual "abuse of process," the coercive threats undergirding the *Alford* plea.  *See* ECF No. 28 ¶ 298 ("The legal proceeding against Mr. Tempest became perverted to accomplish an ulterior or wrongful purpose for which it was not designed in 2017, when the Attorney General's Office issued the following threat to Mr. Tempest's trial counsel: if Mr. Tempest were convicted a second time, it would recommend an 85-year sentence and object to parole for the rest of his life.")  True, Mr. Tempest pled that the threat "forced" him "into the untenable position of having to choose between entering a plea or taking his chances at a second trial where he knew the deck would be stacked against him, as the State intended to use at a second trial much of the evidence that was tainted by" Mr. Pennington's misconduct.  *Id.* ¶ 301.  But the Court cannot say after reviewing the record that Mr.

Pennington was involved enough in the threat or the *Alford* proceedings for the claim to survive.

Indeed, discovery has shown that Mr. Pennington's pretrial involvement had nothing to do with the *Alford* plea. AAG Bush stated that he "did not have any conversations with Mr. Pennington" about whether the Attorney General's Office would object to parole and that Mr. Pennington was not involved in the discussions about the *Alford* plea. (ECF No. 61-2 at 121–22.) AAG Youngs stated that he spoke to Mr. Pennington "shortly before and probably days before" the *Alford* plea "was entered" in December 2017 and that AAG Youngs, not Mr. Pennington, initiated the conversation to "let him know it was going to happen" because he "was so invested in this case." ECF No. 61-3 at 29, 60–61; *see also* ECF No. 62-1 at 13 ("I know I didn't call to ask his permission, but he was certainly in agreement with it.") And the fact that Mr. Pennington stated his enthusiasm for the *Alford* plea ahead of its acceptance, Mr. Tempest's purported "smoking gun," does little to show his influence in the process. (ECF No. 62-1 at 12.) Read in its proper context, that "smoking gun" looks more like a dribbling water pistol. None of the evidence shows that Mr. Pennington was anything more than an invested observer in the plea process, and that is not enough. *T.J. by & through Johnson*, 615 F. Supp. 3d at 124.

Mr. Tempest's main theory to the contrary—that a reasonable jury could find that Mr. Pennington, in improperly coaching a witness again, weakened the State's already frail case and thus forced their hand into the coercion and the *Alford* plea—finds no support in the record. For one, the only record evidence reflects that Judge

Krause, not the Attorney General's Office, conceived of the *Alford* plea in October 2017. (ECF No. 61-3 (Youngs Dep. I) at 22 ("The *Alford* plea was driven by Judge Krause.")). To boot, nothing shows that Mr. Pennington was himself involved in the issuance of the threat. The connections that Mr. Tempest tries to draw between Mr. Pennington's actions in 2017 and the threat's issuance are implausible and attenuated, and the Court thus cannot draw the inference in his favor. At summary judgment, that is fatal. *See, e.g.*, *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (explaining that summary judgment's role is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial") (cleaned up); *Lawton v. State Mut. Life Assur. Co. of Am.*, 101 F.3d 218, 222–23 (1st Cir. 1996) ("Though the district court must interpret the record in the light most hospitable to the nonmoving party, reconciling all competing inferences in that party's favor, the nonmovant has a corresponding obligation to offer the court more than steamy rhetoric and bare conclusions.") (cleaned up).

With that, the Court finds that no "genuine issue of material fact" exists and that "no reasonable jury" would favor Mr. Tempest, so summary judgment is GRANTED for the Defendants as to Count II. *See Quintana-Dieppa*, 130 F.4th at 7-8.

## B.    Count III: Respondeat Superior

Because the Court granted summary judgment on Count II, summary judgment is also necessary on Count III, respondeat superior liability. "It is well settled that under the doctrine of respondeat superior, the act of the employee is

imputed to the employer." *Mainella v. Staff Builders Indus. Servs., Inc.*, 608 A.2d 1141, 1144 (R.I. 1992). But because there is no underlying unlawful act remaining here, the respondeat superior claim necessarily fails.

Summary judgment is thus GRANTED for the Defendants as to Count III.

### C.    Count I: *Monell* Liability

All that now remains is the *Monell* claim. The Court previously denied the Defendants' attempt to dismiss the *Monell* claim because, although the underlying claims were mostly time-barred, the "statute of limitations applicable to a *Monell* claim against the municipality is not necessarily the same as that which governs actions against individuals in the employ of the municipality." (ECF No. 26 at 28.)

Now that there are no remaining claims against the officers—some dismissed on statute of limitations, and two now adjudicated via summary judgment—it is worth revisiting the *Monell* claim and the Court's past denial of its dismissal. *See Fernandez-Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir. 2008) (explaining that district courts have "the inherent power" to reconsider interlocutory orders). The Court previously held that there are "no factual allegations in the Complaint that would allow the Court, at this juncture, to determine when the plaintiff gained sufficient knowledge of the municipal policies he alleges, or even knowledge that would give rise to a duty to inquire." (ECF No. 26 at 39.) The Court must reverse that ruling and DISMISS the *Monell* claim

Again, *Ouellete v. Beaupre* explains the proper statute of limitations analysis. 977 F.3d 127, 135–42 (1st Cir. 2020). As the First Circuit has recognized, the caselaw

is not a "model of clarity" in all aspects of the analysis, but its contours are generally lucid.  *Id.* at 138.  "Under federal law, a § 1983 claim accrues when the putative plaintiff has a complete and present cause of action," or "when the plaintiff can file suit and obtain relief."  *Id.* at 135 (cleaned up).  Usually, "a § 1983 plaintiff has 'a complete and present cause of action' when all of the acts comprising the specific constitutional violation have been completed."  *Id.* at 136 (cleaned up).  Still, under "the federal discovery rule, accrual is delayed until the plaintiff knows, or should know, of those acts."  *Id.* (cleaned up).  "Specifically, a plaintiff must, or should, be aware of both the fact of his or her injury and the injury's likely causal connection with the putative defendant."  *Id.* (cleaned up).

Yet there are cases where "an injury may lie dormant without manifestation until days, months, or even years after it has occurred" or where the "facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain."  *Id.* (cleaned up).  In those circumstances, the First Circuit has explained that "the federal discovery rule delays accrual until 'a reasonably prudent person similarly situated' to the plaintiff would discover these two key pieces of factual information – namely, the existence of the injury and its probable cause."  *Id.* (cleaned up).

In looking at whether the "reasonably prudent person" should know to file suit, the First Circuit charges the plaintiff "with knowledge of two discrete, but related, sets of data: (1) the generally available information about the relevant facts, and (2) the likely results of any further inquiry that a reasonable plaintiff, knowing these

facts, would undertake." *Id.* at 137 (cleaned up). Sometimes, the generally available information "that alerted, or should have alerted, the plaintiff to both his or her injury and its likely cause will come to light at some point after the plaintiff suffered the injury but before the plaintiff has undertaken any independent investigation or inquiry." *Id.* (cleaned up). The claim accrues at that point. *Id.*

But sometimes, the "generally available information may not be sufficient for accrual, but it may be sufficient to trigger a suspicion in a reasonable person in the plaintiff's circumstances regarding a putative defendant's role in causing the plaintiff's injury." *Id.* at 137 (cleaned up). And in those "investigative scenarios," the claim accrues "at the point during the investigation when sufficient facts are or should be uncovered through the exercise of due diligence to give a plaintiff enough information about his or her injury and its cause to file suit." *Id.* at 139 (cleaned up). So the claim "accrues only when a plaintiff, through diligent investigation or inquiry, uncovers or should have uncovered enough facts to take the necessary steps to take legal action to preserve his or her rights." *Id.* at 138 (cleaned up).

The Court now applies that multi-level framework to Mr. Tempest's *Monell* claim. His claim against the City of Woonsocket is about Woonsocket's "policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations," specifically "during the time of Mr. Tempest's wrongful arrest and conviction, and for years beforehand." ECF No. 1 ¶ 299; No. 28 ¶ 276. Reference to the same timeframe occurs in the next paragraph, too. ECF No. 1 ¶ 300; No. 28 ¶ 277.

That period, starting in 1992 and looking backward indefinitely, is critical to the analysis.

Statements from the Complaint offer clear insight into when the *Monell* claim accrued. Mr. Tempest references the Rhode Island Superior Court opinion three times in the Complaint. (ECF No. 1 ¶¶ 3, 49, 186–229.) He details Judge Procaccini's factual findings, derived from his July 13, 2015, opinion, regarding the WPD's improper conduct during the initial investigation and conviction in the 1980s and 1990s. ECF No. 1 ¶¶ 188–217; *see also Tempest, Jr. v. State*, No. PM-2004-1896, 2015 WL 4389908, at *21–28 (R.I. Super. July 13, 2015) (describing, as Mr. Tempest puts it, how WPD violated his constitutional rights "through improper police practices" in the 1980s and 1990s); *id.* at *17–19 (describing, as Mr. Tempest puts it, how WPD violated his rights by "suppressing exculpatory information" in the 1980s and 1990s).

Judge Procaccini specifically noted in 2015 that "there is substantial evidence on the record establishing improper police practices, particularly related to witnesses adopting different or completely new versions of events to match theories held by their police interviewers." 2015 WL 4389908, at *21 (footnote removed); *see also* ECF No. 1 ¶ 16 (quoting that language). He also held that "the taint of improper police procedure so poisoned the well that Mr. Tempest's conviction cannot stand" and found that the "practices of the Woonsocket Police Department created an environment for questioning that was unnecessarily suggestive." 2015 WL 4389908, at *28 (cleaned up); *see also* ECF No. 1 ¶¶ 23, 202 (quoting the "poisoned the well" language).

In his Complaint, Mr. Tempest also details how the Rhode Island Supreme Court affirmed the vacatur of his conviction on July 14, 2016, and denied the State's motion to reargue on November 10, 2016.  *See* ECF No. 1 ¶¶ 230–240 (describing original opinion); *id.* ¶¶ 241–43 (describing its denial of state's motion to reargue).

The Court concludes that Mr. Tempest's municipal liability claim accrued at the latest on November 10, 2016, when the Rhode Island Supreme Court affirmed its decision.  By that point, Mr. Tempest had three different judicial opinions confirming improper conduct by WPD officers during the relevant period for the *Monell* claim: the "time of Mr. Tempest's wrongful arrest and conviction, and for years beforehand." (ECF No. 1 ¶ 299.)  So Mr. Tempest had already conducted a successful investigation by then and even had received judicial imprimaturs on the impropriety of Woonsocket Police tactics during the period.  That surely triggers the accrual period, because he had a "a complete and present cause of action."[4]  *Ouellette*, 977 F.3d at 135 (cleaned up).  After all, "the Rhode Island judiciary's decisions in his favor clearly laid out "sufficient facts" that were "uncovered through the exercise of due diligence to give" Mr. Tempest "enough information about his . . . injury and its cause to file suit," and they also removed other barriers, like *Heck v. Humphrey*, so he could do so.  *Id.* at 139.

Yet Mr. Tempest did not file his Original Complaint until December 17, 2020—at least four years after accrual, assuming an accrual date of November 16, 2016, as

---

[4] As explained in the Court's previous opinion dismissing another claim, *Heck v. Humphrey* was no bar to Mr. Tempest's ability to bring suit by July 14, 2016.  (ECF No. 26 at 24.)  The same reasoning applies here.

late a date as reasonably possible.  (ECF No. 1.)  He thus filed at least one year too late.  *See* R.I. Gen. Laws § 9-1-14(b) ("Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue . . . .");  *Ouellette*, 977 F.3d at 135 (explaining that federal courts apply a "state's designated limitations period for general personal injury torts" in analyzing the limitations period for § 1983 claims).  Dismissing the case on these grounds is warranted because Mr. Tempest's allegations "leave no doubt" that the claim is "time-barred."  *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005).  Count I is thus DISMISSED WITH PREJUDICE.

## IV.   CONCLUSION

Mr. Tempest's ordeal highlights grave injustices in both the criminal and civil litigation systems.  *See, e.g.*, ECF No. 26 at 37–38.  The investigatory and prosecutorial misconduct that led to the Rhode Island Superior Court's decision to vacate his sentence is a tragedy in criminal justice.  *Id.*  One would think, given the gravity of those injustices, that his ordeal should be actionable—that Mr. Tempest should at least be compensated for what he has been put through.

But the failure of Mr. Tempest's corresponding civil case highlights how the field of civil rights litigation is riddled with doctrines, rules, and mechanisms that make claims like Mr. Tempest's nearly impossible to bring successfully.  Sovereign immunity, prosecutorial immunity, the statute of limitations, and the *Heck v. Humphrey* bar all limited or complicated who Mr. Tempest could sue, what he could sue for, and when he could do so.  Those doctrines, rules, and mechanisms essentially

whittled down his viable causes of action to one narrow, technical, and historically disfavored claim that hardly does justice to the situation. And the Court, bound as it is by the law, cannot let that claim (nor the ancillary claim attached to it) proceed any further.

Having given Mr. Tempest every reasonable opportunity to make his case, having reviewed the record in the light most favorable to him, and having still failed to see enough evidence for any reasonable jury to rule in his favor on his remaining claims, the Court GRANTS the Defendants' Motion (ECF No. 65) as to Counts II and III. Count I is also DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

August 12, 2025